IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

HORSETAIL TECHNOLOGIES, LLC,
d/b/a THINK|STACK
*Plaintiff*

v.

Civil Action No. ELH-18-556

DELAWARE STATE POLICE FEDERAL
CREDIT UNION,
*Defendant.*

1370

## MEMORANDUM OPINION

This case arises from a dispute concerning a series of agreements for information technology ("IT") services.  Plaintiff Horsetail Technologies, LLC ("Horsetail"), which does business as Think|Stack, is a Baltimore-based provider of computer software and hardware as well as IT services.  Defendant and counter-claimant Delaware State Police Federal Credit Union ("DSP") is a non-profit financial cooperative with approximately 10,000 members.  Between 2012 and 2017, Horsetail provided hardware and IT services to DSP, pursuant to six contracts.  Unfortunately, things soured between the parties, and DSP terminated the relationship in January 2018.  Horsetail and DSP now disagree as to which party breached the various agreements.

Horsetail filed suit against DSP, alleging breach of contract and anticipatory breach of contract.  ECF 1 (the "Complaint").  Jurisdiction is founded on diversity of citizenship.  *Id.* ¶ 9; *see* 28 U.S.C. § 1332.  DSP filed a combined answer and counterclaim.  ECF 9 (the "Counterclaim").  DSP asserts a claim for breach of contract and also seeks declaratory judgment, to include rulings that it effectively terminated the agreements and does not owe any money to Horsetail.  Both sides seek attorneys' fees and costs.  *See* ECF 1, ¶ 67; ECF 9, ¶ 133.

After a lengthy discovery period, Horsetail filed a motion for summary judgment as to all claims and counterclaims.  ECF 49.  The motion is supported by a memorandum of law (ECF 49-1) (collectively, the "Horsetail Motion") and 31 exhibits.  ECF 49-3 to ECF 49-34.  DSP opposes the Horsetail Motion and filed a cross-motion for partial summary judgment.  ECF 57.  That motion is also supported by a memorandum (ECF 57-1) (collectively, the "DSP Motion") and many exhibits. ECF 57-2 to ECF 57-26.  Horsetail filed a combined opposition to the DSP Motion and a reply in support of its own summary judgment motion.  ECF 58.  DSP has replied.  ECF 59.

The motions are fully briefed, and no hearing is necessary to resolve them.  *See* Local Rule 105.6.  For the reasons that follow, I shall deny the Horsetail Motion.  And, I shall grant the DSP Motion in part and deny it in part.

## I.    Background[1]

### A.  The Parties

Horsetail, a Maryland limited liability company based in Baltimore, was formed in July 2011.  ECF 1, ¶ 7; ECF 57-12 (Mark Berman Deposition) at 16.  Horsetail, now doing business as Think/Stack, designs and provides technology services and solutions for credit unions and other financial institutions.  ECF 49-3 (Christopher Sachse Affidavit), ¶ 3.  At all relevant times, Christopher Sachse was Horsetail's Chief Executive Officer ("CEO"); Travis Sachse was the Chief Financial Officer ("CFO"); and Mark Berman was the Chief Information Officer ("CIO").  ECF 49-3, ¶ 2; ECF 49-6 (Travis Sachse Affidavit), ¶ 2; ECF 49-12 (Mark Berman Affidavit), ¶ 2.[2]

DSP is a not-for-profit financial cooperative, established under the Federal Credit Union

---

[1] The Court cites to the electronic pagination, which does not always correspond to the page number imprinted on the submission.

[2] Given the common surname of Christopher and Travis Sachse, I shall sometimes refer to them by their first names, or by use of a first initial, in order to avoid confusion.

Act, codified as amended at 12 U.S.C. § 1751 *et seq.* ECF 57-2 (Ina Fitch Affidavit), ¶ 2. It is principally based in Georgetown, Delaware and has additional branches in Cheswold and New Castle, Delaware. *Id.* Comprised of approximately 10,000 members, DSP primarily serves individuals in law enforcement or those who are employed or previously employed by federal, state, and local government. *Id.* ¶ 3. In total, DSP has deposits of roughly $ 122,000,000. *Id.* As a federally chartered credit union, DSP is subject to oversight by the National Credit Union Administration ("NCUA"), an independent federal regulator, and it must also comply with the basic standards of the Federal Financial Institutions Examinations Council. *Id.* ¶ 8.

Steve Cimo served as DSP's CEO from at least 2012 until October 23, 2017, when Ina Fitch became DSP's CEO. *Id.* ¶ 4. Blanche Jackson served as DSP's Executive Vice President from at least 2012 until September 12, 2016, when she resigned from DSP to take a position at the Sussex County Federal Credit Union. ECF 49-10 (Jackson Deposition) at 78; ECF 49-18 (9/12/2016 email from Jackson to Berman). In addition, Jackson served on Horsetail's Board of Advisors from at least November 2011 until September 2012. ECF 57-8 (Horsetail Board of Advisors emails). It is unclear if and when Jackson stepped down from her advisory role at Horsetail. Throughout the relevant time, Regina deFreitas served as DSPS's System Administrator. ECF 57-2, ¶ 28.

DSP and Horsetail entered into a business relationship in January 2012, by which Horsetail provided DSP with computer hardware and IT services. Horsetail asserts that the parties entered into a series of written agreements over the next five years to memorialize various deals.

## B. The Contracts

### I. The 2012 Services Agreement

The relationship between Horsetail and DSP began on December 13, 2011, when the parties

entered into the DSP Services Agreement, which went into effect in January 2012 (the "2012 Services Agreement").  ECF 49-4 at 3; *see* ECF 49-1 at 2; ECF 57-1 at 16.[3]  Jackson, then DSP's Executive Vice President, executed the agreement.  ECF 49-4 at 14.  She was also identified as the "primary Client contact."  *Id.* at 15.  The 2012 Services Agreement identified "Gina deFreitas" as Horsetail's "secondary Client contact."  *Id.*  Christopher Sachse was listed on the contract as the "Account Manager/ Primary Contact."  *Id.*

The 2012 Services Agreement required Horsetail to provide certain "Managed Services" for a $1,500 setup fee and a monthly fee of $2,500.  *Id.* at 3, 24.  The contract's "Period of Service" provides for an initial term of 14 months.  *Id.* at 3.  Further, the contract provides, *id.*: "This Agreement shall renew automatically at the end of the Initial Term (March 15, 2012) for a period of twelve (12) months, and for successive twelve (12) month periods thereafter ('each a Renewal Term') unless Horsetail or [DSP] affirmatively gives notice of its intent to terminate this Agreement at least thirty (30) days prior to the start."  Under the 2012 Services Agreement, either party could terminate the contract if, among other things, "Horsetail fails to perform its obligations under this Agreement and such failure continues for a period of thirty (30) days after written notice from Client of the default . . . ."  *Id.* at 9.

It is undisputed that DSP paid all monthly fees required by the 2012 Services Agreement until August 2016, at which point Horsetail began billing DSP, pursuant to a new Master Services Agreement.  *See* ECF 49-6, ¶ 3; *see also* ECF 49-1 at 2; ECF 57-1 at 17.

---

[3] The 2012 Services Agreement states that it was effective as of "January 15, **2011**."  ECF 49-4 at 3 (emphasis added). However, the parties agree that this is an error, and that the contract went into effect on January 15, **2012**.  ECF 49-1 at 2; ECF 49-6, ¶ 3; ECF 57-1 at 16-17.

II. The 2012 Email Agreement

The parties executed a one-page addendum to the 2012 Services Agreement on February 7, 2012, by which Horsetail agreed to provide DSP with certain email security services (the "2012 Email Agreement").   ECF 49-7.   Specifically, Horsetail agreed to provide "HT Cloud Email Encryption" services for 38 email accounts and "HT Cloud Email Security" services for 57 emails accounts, each at a cost of $10 per unit per month.   *Id.*   Horsetail also charged DSP a one-time installation fee of $750.   *Id.*   The contract was prepared by Christopher Sachse and executed by Jackson on behalf of DSP.   *Id.*

The 2012 Email Agreement provides: "This quote is an addendum of the existing Service Agreement, terms and conditions are as stated in the agreement *except term*."   *Id.* (emphasis added).   As to the length of the contract, the 2012 Email Agreement provided that it is a "3 year agreement paid monthly," with $1,415 due "immediately" and the remaining 35 payments invoiced monthly.   *Id.*

According to C. Sachse, the parties understood at the time of contracting that the phrase "Service Agreement" in the 2012 Email Agreement referred to the 2012 Services Agreement.   ECF 49-3, ¶ 8.   As to the renewal of the contract, Christopher maintains that Jackson "agreed that at the end of the initial 3-year term of the 2012 Email [Agreement], this addendum would to continue [sic] automatically renewing for successive 12-month periods, just as the 2012 Services [Agreement] renews, unless either party gave notice of its intention to terminate."   ECF 49-3, ¶ 9. Therefore, because DSP did not send notices of termination on or by February 15 in 2015, 2016, 2017, 2018, or 2019, C. Sachse posits that the 2012 Email Agreement renewed each of those years for 12 months.   *Id.* ¶  10.

Likewise, Travis Sachse is of the view that because DSP has never sent a notice of termination, the 2012 Email Agreement is valid until March 2020. *See* ECF 49-6, ¶ 7. Travis attests that DSP paid every monthly invoice under the 2012 Email Agreement between January 2012 and October 2017. ECF 49-6, ¶ 5. He maintains that when DSP severed ties with Horsetail in November 2017, Horsetail was providing security services for 53 "DSP users and mailboxes," for a total cost of $795 per month. *Id.* ¶ 6; *see also id.* at 10 (11/10/2017 invoice; charging $530 for "Email Encryption Service" and $265 for "Email Security Service"). The number of DSP accounts increased to 54 in December 2017, resulting in a charge of $810.00 per month for email security services. *Id.* ¶ 6; *see also id.* at 12 (12/10/2017 invoice). Therefore, Horsetail has invoiced DSP for 54 mailboxes from November 2017 until March 2020. *Id.* ¶ 7.

According to Horsetail, the total contract fees owed by DSP from November 2017 through March 2020 amount to $22,665. *Id.* ¶ 9. Accounting for service costs, Horsetail calculates that it is entitled to recover $19,240.59 in lost profits due to DSP's breach of the 2012 Email Agreement. ECF 49-1 at 5; ECF 49-6, ¶ 9. Further, because the 2012 Email Agreement provides that "Interest Charges on Past Due Accounts and Collection Costs Overdue amounts shall be subject to a monthly finance charge," ECF 49-7, Horsetail contends that it is entitled to interest on all 22 unpaid invoices generated under the 2012 Email Agreement. ECF 49-6, ¶ 10.

Fitch contends that DSP had no record of the 2012 Email Agreement and only learned of it when Horsetail disclosed it during discovery. ECF 57-2, ¶ 85. But, she does not dispute its validity. Instead, DSP asserts that the contract expired. *See* ECF 57-1 at 18; ECF 57-2, ¶ 86. According to DSP, the 2012 Email Agreement, by its express terms, was not subject to automatic renewals as provided by the 2012 Services Agreement. ECF 57-1 at 18. For support, DSP points out that T. Sasche acknowledged during his deposition that the 2012 Email Agreement did not

address whether it automatically renewed upon the expiration of the initial 36-month term. ECF 57-23 at 6. And, he admitted that Horsetail has no written confirmation that Jackson or any other DSP officer promised to pay for email encryption services after the initial 36-month term. *Id.* at 23. Further, Jackson testified at her deposition that DSP "didn't have verbal contracts." ECF 49-12 at 2. Therefore, DSP argues that the 2012 Email Agreement expired by its own terms on February 7, 2015 and, if anything, was subject to extension on a month-by-month basis. ECF 57-1 at 18; ECF 57-2, ¶ 86.

### III. The 2013 Technology Agreement

Horsetail asserts that the Jackson, on behalf of DSP, executed a quote with Horsetail on May 3, 2013, to lease certain electronic equipment for a monthly fee of $3,220, plus a one-time setup fee of $6,440. ECF 49-8; *see* ECF 49-1 at 5. To memorialize the terms of the lease, on June 13, 2013, Jackson and DSP executed a "Technology as a Service Agreement" (the "2013 Technology Agreement"), with an effective date of June 1, 2013. ECF 49-9.

Notably, the copy of the 2013 Technology Agreement furnished by Horsetail is not signed. *See* ECF 49-9; *see also* ECF 49-1 at 5 (conceding that ECF 49-9 is unsigned). In support of the contract's validity, Horsetail points out that Jackson testified during her deposition that she "believe[s]" that DSP and Horsetail entered into a technology agreement in 2013. ECF 49-10 at 2. And, Horsetail notes that, during his deposition, Berman recalled having seen an executed version of the 2013 Technology Agreement in June 2013. ECF 49-11 (Berman Deposition) at 6.

The unsigned 2013 Technology Agreement indicates that "all of the terms and condition[s] of the Master Services Agreement are incorporated by reference . . . ." ECF 49-9 at 1. Although it identifies the "Master Services Agreement" as one dated May 1, 2013, the parties agree that no such agreement exists. ECF 49-1 at 5-6; ECF 57-1 at 20; *see also* ECF 49-11 at 4.

7

Pursuant to the terms of the unsigned 2013 Technology Agreement, Horsetail agreed to "provide" to DSP the devices contained in "Appendix A." ECF 49-9 at 2. In turn, Exhibit A lists switches, routers, and bandwidth monitors. *See id.* at 8. Notably, the contract provides, *id.* at 2: "Devices and all software provided by Horsetail shall remain the sole and exclusive property of Horsetail." Horsetail maintains that, shortly after the contract was executed in June 2013, it purchased and installed at DSP's locations the equipment listed in Exhibit A of the 2013 Technology Agreement. ECF 49-12, ¶ 5.

Per the contract, Horsetail agreed that devices "installed on site for more than Initial Term or at the end of a Renewal Term" would "be replaced with a new Device meeting Horsetail's then current specifications." ECF 49-9 at 2. The 2013 Technology Agreement provides that the contract would last an initial term of 36 months. *Id.* at 8. At the end of the "service term," DSP had four options, *id.* at 2:

BUYOUT / RENEWAL / PURCHASE OPTIONS

**Option 1:** Extend the existing service term for a predetermined period of time (minimum of 12 months) with the existing hardware and software. The monthly billing rate for existing hardware and software agreement 50% of the rate of service as listed in the below appendix.

**Option 2:** Upgrade the hardware and software in place with then current versions of the same products with like options and extend the contract for a term equal to the initial term for the item.

**Option 3:** Return the equipment at the end of the term (client will be given a 30 day grace period to transition).

**Option 4:** Purchase equipment from Horsetail. Client to be responsible to pay for any and all licensing required to successfully transition servers to client. Labor associated with this transition or upgrades not planned in throughout the term will be billed at the rates contained in the Master Services Agreement. Horsetail will provide client with a proposal for this service 60 days prior to the expiration of the term.

Horsetail acknowledges that DSP timely paid the set-up fee and the $3,220 monthly fee for the entirety of the initial term.  ECF 49-1 at 6; ECF 49-6, ¶ 11.  According to T. Sachse, when the initial term expired, DSP did not seek to upgrade or return the equipment, nor did it ask to purchase the equipment from Horsetail.  ECF 49-6, ¶ 12.  Therefore, in his view, DSP triggered "Option 1" of the 2013 Technology Agreement in June 2016.  *Id.*  According to Travis, Horsetail sent DSP discounted invoices and DSP paid the discounted monthly fee for the first 12-month renewal period term, which extended through June 2017.  *Id.*

DSP again kept the equipment in June 2017 and continued paying the discounted monthly fee from July 2017 through and including October 2017.  *Id.* at ¶ 14.  However, DSP stopped the payment of invoices, beginning with the November 2017 invoice.  *Id.* ¶ 14.  To date, DSP has not returned the equipment to Horsetail.  *See id.*

According to Horsetail, as of August 2019, DSP has not paid 22 invoices (November 2017 through August 2019), each in the amount of $1,310.  *See id.* at ¶ 16.  Therefore, Horsetail avers that, as of August 2019, DSP owes it a total of $28,820 for breach of the 2013 Technology Agreement.  *See id.*  Further, Horsetail contends that DSP will continue to owe $1,610 each month that it retains the equipment.  *Id.*  Accounting for costs, Horsetail thus maintains that it is owed $31,625 in lost profits under the 2013 Technology Agreement, assuming the equipment is returned in June 2020.  *See id.* ¶¶ 14-18.  Horsetail also maintains that it is entitled to interest on these lost profits.  *Id.* ¶ 18.

DSP questions whether the document provided by Horsetail is authentic.  *See* ECF 57-1 at 20.  However, to the extent that it is valid, DSP contends that the 2013 Technology Agreement expired under its own terms 36 months after it was purportedly effective, *i.e.,* on June 1, 2016.  *Id.* Further, as discussed, *infra*, DSP asserts that an audit of DSP's IT conducted in 2017 revealed that

the equipment provided by Horsetail under the 2013 Technology Agreement either did not exist or was significantly outdated.  ECF 57-2, ¶¶ 37-39, 94.  And, as DSP points out, ECF 57-1 at 23, the 2013 Technology Agreement expressly permits DSP to terminate the contract "[i]f Horsetail fails to perform its obligations under this Agreement and such failure continues for a period of thirty (30) days after written notice from Client of the default . . . ."  ECF 49-9 at 6.  In that circumstance, the "Client shall have the right to terminate this Agreement."  *Id.*  Thus, DSP avers that even if the unsigned 2013 Technology Agreement is deemed binding and did not expire on June 1, 2016, it is not liable to Horsetail because Horsetail failed to perform its obligations under the contract and DSP terminated the agreement in January 2018, after giving Horsetail 30 days' notice.  *See* ECF 57-1 at 24.

### IV. The 2016 Master Services Agreement

On August 22, 2016, the parties executed a "Master Services Agreement," effective September 1, 2016.  ECF 49-14.  The Master Services Agreement was digitally signed by Jackson and Christopher Sachse.  *Id.* at 15.  The contract incorporates by reference "Standard Additional MSA Terms" and "Supplemental Terms of Service" (the "Supplemental TOS").  *See id.* at 1.

The Master Services Agreement replaced the 2012 Services Agreement.  *See* ECF 49-11 at 2; ECF 49-13 (T. Sachse Deposition) at 3.  It requires Horsetail to perform "the agreed-upon Services" for DSP as described in "Exhibit A."  ECF 49-14 at 1.  The services included in Exhibit A are "HT Predictive Network Maintenance Service," "HT Helpdesk Service," "HT Admin Service," "HT Primary Firewall Management Service," and "Disaster Recovery."  *Id.* at 7.  The deliverables encompassed by those services are delineated in Exhibit B of the Master Services Agreement.  *See id.* at 8.  Pursuant to the Master Services Agreement, Horsetail shall provide

services "in a good, workmanlike and professional manner, and substantially in conformance with the description of Services as set forth on [Exhibits A & B]."  ECF 49-14 at 3.

According to Horsetail, a client is entitled only to those services included in Exhibit B that are also identified on Exhibit A and for which it pays a fee.  ECF 49-1 at 9.  For instance, "HT Firewall Monitoring," which is listed on Exhibit B, is not a service referenced in Exhibit A.  ECF 49-14 at 7, 10.

Notably, Disaster Recovery, which is referenced in Exhibit A, does not appear on Exhibit B.  *Id.* at 7-11.  Berman avers that, at the time of contracting, he explained to Jackson in August 2016 that Disaster Recovery services would include annual recovery testing performed by Horsetail, provided that DSP set up "a disaster recovery environment."  *See* ECF 49-12, ¶ 7. According to Berman, although Jackson agreed to these terms, DSP never set up the disaster recovery environment and so Horsetail never billed DSP for Disaster Recovery services.  *See id.*; *see also* ECF 49-13 at 5-6 (T. Sachse stating that he heard from Berman about Berman's conversation with Jackson concerning Disaster Recovery).  Otherwise, Berman maintains that Horsetail provided all services identified on both Exhibits A and B of the Master Services Agreement in a good, workmanlike, and professional manner.  ECF 49-12, ¶ 8.

Further, Horsetail observes that Section 4.2 of the Master Services Agreement obligates DSP to "grant Horsetail permission to have secure remote access into [DSP's] network pursuant to a remote access solution expressly approved by Horsetail."  ECF 49-14 at 2.  DSP also had to "promptly inform Horsetail of any modification, installation, or service performed on the Network by individuals not employed by Horsetail in order to assist Horsetail in providing the Services as contemplated hereunder." *Id.*  In the same vein, the version of the Supplemental TOS furnished by Horsetail provides that Horsetail has "the EXCLUSIVE right" to provide the services described in

the Master Services Agreement and prohibits DSP from using or retaining any other person or entity from performing the same services.  ECF 49-16 at 3 (emphasis in original).  Therefore, under the terms of the Supplemental TOS, any work performed "without the express written approval of Horsetail is prohibited and shall constitute a breach hereunder."  *Id.*

Exhibit A of the Master Services Agreement provides for a contract term of 60 months. ECF 49-14 at 7.  Therefore, the initial term of the Master Services Agreement is set to expire on September 1, 2021.  The Supplemental TOS provides that services under the Master Services Agreement could be terminated by either party by written notice provided at least thirty days before the beginning of the next month, but also provides that "if [DSP] terminates these Managed Services before the expiration of the Managed Services Term, [DSP] shall remain liable to Horsetail for all obligations hereunder for the balance of the Managed Services Term . . . ."  ECF 49-16 at 3.

The parties agree that DSP paid the invoiced monthly fees included in Exhibit A under the Master Services Agreement for the first year.  *See* ECF 14-6, ¶19.  And, Horsetail does not dispute that DSP paid invoices for August, September, and October 2017, including the 3% annual fee increase provided by the contract.  ECF 49-1 at 11; ECF 14-16, ¶ 19.  However, Horsetail maintains that DSP stopped payment after October 2017, and that Horsetail provided services in November and December of 2017 and January of 2018, without payment.  ECF 14-6, ¶ 20.  Accounting for costs to provide these services and for lost profits through the end of the contract term, Horsetail contends that DSP owes $88,460.47 in lost profits.  *Id.* ¶ 25.  Further, because the Master Services Agreement provides that "[l]ate payments hereunder shall accrue interest at the rate of 1.5% percent [sic] per month and shall be subject to a late payment charge of 5% of the past due amount," ECF 49-14 at 3, Horsetail asserts that it is entitled to interest on its lost profits.  ECF 49-1 at 11;

ECF 49-6, ¶ 26.  And, it contends that it is entitled to attorneys' fees, pursuant to a provision in the Supplemental TOS providing that Horsetail shall receive attorneys' fees equal to 15 percent of any balance due if an overdue invoice is turned over for collection.  *See* ECF 49-6, ¶ 27; ECF 49-16 at 1.

Here too, DSP challenges the validity of the Master Services Agreement and its ancillary agreements.  ECF 57-1 at 24.  As to the Master Services Agreement, Horsetail observes that at Jackson's deposition, Jackson did not recall having seen the version of the 2016 Master Services Agreement that included a five-year term, nor did she recall signing such a contract.  *See* ECF 57-22 (Jackson Deposition) at 15-19. Instead, DPS maintains that email correspondence suggests that Horsetail created the Master Services Agreement to replace the 2012 Services Agreement and was endeavoring to persuade DSP to sign it but never managed to close the deal.  ECF 57-1 at 25 (citing ECF 57-4).

In December 2015, Horsetail began negotiating with Jackson to enter into a multi-year contract to provide IT services to DSP.  *See* ECF 57-3 (December 2015 emails between Joe Ireland, Horsetail Sales Executive; Jackson; and Chris Sachse).  On January 6, 2016, Jackson forwarded a version of the proposed Master Services Agreement to DSP's attorney, Christopher Pippett, for review.  ECF 57-4.  Jackson explained to Pippet that Horsetail had developed a new Master Services Agreement, and that she was "working on a three year contract with them."  *Id.* at 2.  The Master Services Agreement attached to that email does not contain a 3-year term.  *Id.* at 3-9. Rather, it simply states that the term "shall be as stated" on the Schedule of Services, which was left blank.  *Id.* at 9.

By email dated February 23, 2016, Joe Ireland, a Sales Executive at Horsetail, contacted Jackson, seeking an update on the status of the Master Services Agreement.  ECF 57-6 at 4. Jackson

responded that she had not received her counsel's recommendations but expected to hear back in the next few days.  *Id.*  On February 29, 2016, Pippett sent Jackson a "red-lined" version of the Master Services Agreement containing his proposed revisions.  ECF 57-5 at 2.  On March 16, 2016, Ireland again contacted Jackson, asking if her counsel had any feedback, and Jackson replied that she had received revisions but needed time to review them.  ECF 57-6 at 2.  Next, Jackson asked Horsetail on July 24, 2016, to send her the final version of the Master Services Agreement with an electronic signature option, suggesting that she did not have the final draft at that point. ECF 57-7 at 2.  According to DPS, there is no email record to indicate that Horsetail actually submitted a final draft of the Master Services Agreement to Jackson.

At his deposition, Pippett testified that he searched his records and did not find any other emails pertaining to the Master Services Agreement.  ECF 57-26 at 8.   Further, Pippett testified that although he invited Jackson to call him to discuss his proposed revisions of the contract, he did not recall ever discussing the matter.  *Id.* at 11.

DSP also posits that Jackson lacked authority to execute the Master Services Agreement on behalf of DSP.   Jeffrey Weaver, DSP's Chairman of the Board, testified that he believed that only DSP's CEO had the authority to enter into vendor contracts.  ECF 57-25 (Weaver Deposition) at 4-5.  And, he testified that he was not aware of any policy permitting DSP's CEO to authorize another person to execute contracts.  *Id.* at 5. Likewise, Jackson acknowledged at her deposition that she was required to discuss all contracts with DSP's CEO, and that it was her practice to have Cimo review all contracts.  ECF 57-22 at 60.

DSP also questions the authenticity of the Supplemental TOS.  ECF 57-1 at 35-36.  Fitch attests that the document is not dated and was not accessible on Horsetail's website.  ECF 57-2, ¶ 82.  She also notes that DSP lacked a copy of the Supplemental TOS prior to the litigation.  *Id.*

Moreover, as with the 2013 Technology Agreement, DSP asserts that, to the extent the Master Services Agreement is enforceable, Horsetail materially breached the contract such that DSP validly terminated it in January 2018.  *See* ECF 57-2, ¶¶ 114-19; *see* ECF 57-1 at 28-29.

## V. The 2017 SBA

As noted, Jackson departed from DSP in September 2016.  On September 12, 2016, she emailed Berman to inform him that she was leaving DSP for a position at Sussex County Federal Credit Union, beginning on October 3, 2016.  ECF 49-18 at 1.  She told Berman that she was "working on getting [her] responsibilities assigned to the appropriate staff member . . . ."  *Id.*  Berman congratulated Jackson and recommended that they review "remaining DSP items" before her departure.  *Id.*

Thereafter, deFreitas became Horsetail's primary contact at DSP.  ECF 49-12, ¶ 10.  However, Berman states that both deFreitas and Jackson mentioned to him that Jackson "would continue to be involved in the decision-making regarding DSP's IT's systems[,] to participate in decisions concerning DSP's IT[,] and to provide a smooth transition to her replacement, once hired."  *Id.*  Jackson testified at her deposition that, despite having left DSP, she continued to work "on some projects . . . to try to help them get through them in the transition."  ECF 49-10 at 4.  Further, Finch stated that Jackson "had a contract to perform tasks as an independent contractor after her resignation in September 2016," although she did not elaborate on the scope of Jackson's authority.  ECF 57-2, ¶ 55.

On March 23, 2017, DSP and Horsetail entered into the 2017 Server and Backup Replacement Agreement (the "2017 SBA"), in which Horsetail agreed to replace DSP's servers and perform related work, for a total cost of $29,250.50.  ECF 49-20.  The 2017 SBA was electronically signed by deFreitas.  *Id.* at 9.

As is relevant here, the 2017 SBA provides that Horsetail would upgrade DSP's server outlet to a "PowerEdge R730" for $7,000. *Id.* at 4. However, the contract cautions, *id.* (emphasis in original): "**Inventory varies hourly. This server may not be available when the order is placed**." The 2017 SBA further provides that the PowerEdge R730 was accompanied by a 3-year warranty for $2,500. *Id.*

Horsetail maintains that prior to executing the 2017 SBA, Berman explained to Jackson that the server would be a refurbished unit from Dell Outlet. ECF 49-12, ¶ 12. Berman told Jackson that the Dell Outlet offered good deals on warrantied servers but that its inventory varied day-to-day and even hour-to-hour. *Id.* Therefore, he explained that in order to save money on a server from the Outlet, it was unlikely that Horsetail would purchase the precise server with precise features identified in the 2017 SBA. *See id.* According to Berman, Jackson responded that she was comfortable with that possibility and instructed him to place the order. *See id.*

After the 2017 SBA was executed, Berman obtained a R620 model server, which "had several features that exceeded the original specifications of the R730 model . . . but other features that did not match exactly." *Id.* According to Berman, these differences "would not negatively impact the planned uses of the server, and in many respects would be superior to the R730 . . . ." *Id.* ¶ 13. Berman stated that he spoke with Jackson about the R620 server, and she instructed him to purchase it and have it installed at DSP. *Id.*

DSP paid Horsetail a deposit of $16,288 within a month of executing the 2017 SBA. ECF 49-21 (3/24/2017 invoice); ECF 49-22 (3/24/2017 emails from Cimo to deFreitas authorizing payment). Horsetail issued a final invoice to DSP on December 19, 2017, for $12,272.25. ECF 49-23. However, Horsetail avers that DSP has not paid the invoice. ECF 49-6, ¶ 28.

According to Fitch, after paying Horsetail's initial invoice, the project languished and no server was installed.  *Id.* ¶ 100.  It was not until December 2017, when Fitch became CEO and inquired as to the status of the server upgrade, that Horsetail purchased the R620.  *Id.* ¶¶ 64, 101.  Further, Fitch opines that the R620 is inferior to the R730 and does not have enough space on it for DSP's purposes.  *Id.* ¶ 65.

DSP also disputes Jackson's authority to approve Berman's purchase of the R620 server.  According to DSP, Berman knew at the time that Jackson had resigned from DSP, and therefore she had no authority to approve vendor quotes or authorize orders.  *Id.* ¶¶ 64, 103; *see* ECF 49-18.

### VI. The 2017 SQL Agreement

Horsetail asserts that on July 18, 2017, the parties entered into an "Imagecenter SQL Upgrade" agreement (the "2017 SQL Agreement").  ECF 49-24.  "Imagecenter" is software that DSP licenses from a third-party and uses to image checks.  ECF 49-25 (Andrea DiGiacomo, Horsetail's COO, Affidavit), ¶ 3.  The contract was executed by deFreitas.  ECF 49-24 at 5.

Pursuant to the 2017 SQL Agreement, DSP agreed to upgrade certain IT software.  *Id.* at 3.  Specifically, the contract provides that Horsetail will: (1) clone current Imagecenter server; (2) bring the server up; (3) perform an in-place upgrade of SQL; (4) troubleshoot any failures/issues that occur; and (5) once a successful upgrade has been completed, "swap clone with production server."  ECF 49-24 at 2.  The project was estimated to cost of $1,700 to $2,475, *id.* at 3, and DSP paid a deposit of $850 on this project in August 2017.  ECF 49-6, ¶ 29.

Andrea DiGiacomo, Horsetail's Chief Operating Officer, states that Horsetail completed the first two steps and was ready to purchase and install the pertinent SQL software in August 2017.  ECF 49-25, ¶ 3.  However, Horsetail needed confirmation from DSP that its version of Imagecenter would work with SQL 2016, the software that Horsetail proposed to purchase. *See id.*

17

¶ 5.  DiGiacomo emailed Jackson and DeFrietas concerning the project on August 18, 2017, and Jackson responded that she would contact Imagecenter for this information.  *Id.*; *see also id.* at 4 (8/18/2017 emails).  However, DiGiacomo states that she did not hear back from DSP until DeFreitas emailed her in October 12, 2017, informing her that SQL 2016 was not compatible with DSP's current version of Imagecenter. *See id.* ¶ 6.

DiGiacomo stated that she and deFreitas formulated a plan on October 18, 2017, to complete the project.  This entailed Horsetail purchasing a license for SQL 2016 and DSP purchasing a license from Imagecenter to upgrade to 2017 Imagecenter, which was compatible with SQL 2016.  *Id.*; *see id.* at 8.

According to DiGiacomo, DSP did not approve the purchase until late November 2017. *See id.* ¶ 7.  Horsetail purchased the SQL 2016 license for $526 on November 29, 2017, and installed it on or about December 1, 2017.  ECF 49-6, ¶ 29.   Horsetail then notified DSP that it was ready to complete the project as soon as DSP purchased the Imagecenter upgrade.  ECF 49-25, ¶ 9; *see* ECF 49-25 at 18.  However, Horsetail asserts that DSP never responded and so the project was never completed.  *Id.* ¶ 10.  To date, DSP has not paid Horsetail for the $526 for the SQL 2016 license or the $930 in labor costs for the work that Horsetail completed.  ECF 49-6, ¶ 29; ECF 49-25, ¶ 10.

In contrast, DSP contends that Horsetail is to blame for the project's collapse.  DSP notes that on October 10, 2017, deFreitas emailed Larisa Gelis at Horsetail, inquiring as to the status of the project because Horsetail had marked the project as "closed," but the upgrade had not been performed.  ECF 49-25 at 9.  It was only then that DiGiacomo emailed deFreitas, recommending that Horsetail upgrade its ImageCenter server from the 2016 to the 2017 model, because only the 2017 model was compatible with SQL 2016.  *Id.* at 8.  Further, DSP contends that although

Horsetail sent it a quote for the SQL license on October 27, 2017, Horsetail did not actually purchase the software license until November 29, 2017. ECF 57-19 at 3. Further, while the project was originally scheduled to entail approximately 11 to 16 hours of labor, *see* ECF 49-24 at 3, internal emails between Berman and Ireland in November 2017 reveal that Horsetail needed between 16 and 20 hours of labor to perform the installation. *See* ECF 57-19 at 3-4. Therefore, DSP submits that it was Horsetail that failed to fulfill its obligations under the 2017 SQL Agreement. ECF 57-1 at 33.

## C. The Relationship Ends

As noted, Fitch became DSP's CEO in October 2017. ECF 57-2, ¶ 7. As CEO, she is "responsible for overseeing and making all decisions" concerning IT, which she avers is essential to servicing its members and ensuring the security of their assets. *Id.* ¶ 6.

Shortly after taking the helm at DSP, Fitch inspected DSP's IT systems for inefficiencies and security vulnerabilities that might jeopardize its standing with NCUA. *Id.* ¶ 7. Further, Fitch reviewed DSP's contracts for IT services. *Id.* ¶ 9. When she contacted Horsetail regarding the 2012 Services Agreement, she was told that it had been superseded by the Master Services Agreement signed by Jackson in August 2016. *See id.* This struck her as "strange" because she had been informed that only the CEO could enter into contracts. *Id.* Despite searching for the Master Services Agreement, Fitch could not locate it. Ultimately, Horsetail provided her with a copy. *Id.*

In addition, when Fitch joined DSP, she emailed a former business associate, Adam Smith, apprising him of her new job. *Id.* ¶ 21. Smith is the principal of Fayla P.C., an IT company that serviced the credit union where Fitch previously worked. *Id.* According to Fitch, Smith responded that the location from where she had sent her email "had over 300 access points in its firewall and

was extremely vulnerable to hacking." *Id.*; *see also* ECF 57-24 (Smith Deposition) at 4-45, 52 (Smith testifying that he informed Fitch of DSP's porous network).

When Fitch learned that there were serious vulnerabilities in DSP's network, she "immediately" called Horsetail to discuss her concerns. ECF 57-2, ¶ 22.  On October 27, 2017, Fitch spoke with Berman; Ireland; and Mike Burns, Horsetail's Director of Security.  ECF 57-2, ¶ 22.  During the conversation, Fitch raised a host of concerns regarding DSP's IT systems, including her need to have administrative access to the IT system, making sure that former employees were prevented from logging into the system remotely, and upgrading DSP from Windows 7 to Windows 10.  *Id.*  The same day, Fitch received an email from Ireland recording the conversation.  Ireland acknowledged that DSP "is outside of the norm in security and FFIEC basic standards and [Horsetail] recognizes this."  ECF 49-26 (10/27 email from Ireland to Fitch). According to Ireland, Horsetail had "proposed many cures" but that "for the last year, anything new was pending the hire of a new CEO." *Id.*

Fitch followed up with Horsetail again a few days later concerning issues with DSP's IT system.  ECF 57-2, ¶ 25.  On November 2, 2017, Fitch received an email from Berman titled "Laundry List," outlining twelve concerns that Fitch had raised.  ECF 49-27.  Berman noted that Fitch still lacked access to the administrative accounts that she requested, and that Jackson continued to have remote access to the IT network, despite no longer working for DSP.  *Id.*  He also observed that Fitch complained about connectivity lags and that certain printers were not functioning properly.  *Id.*  And, Berman acknowledged that Fitch had requested that Horsetail forward copies of all monthly reports.  *Id.*

Shortly thereafter, various HelpDesk Tickets ("Tickets") were generated for the tasks discussed in the "Laundry List" email.  ECF 57-2, ¶¶ 26-27.  For instance, Ticket #2965541 was

generated on November 2, 2017, requesting that Horsetail delete Jackson's administrative rights from all DSP systems. *Id.* ¶ 26; ECF 57-12 at 15. The next day, Ticket #2965680 was generated requesting that Horsetail grant Fitch administrative rights to DSP's systems. ECF 57-2, ¶ 26; ECF 57-12 at 13. However, Fitch maintains that Horsetail failed to take any action. *See* ECF 57-2, ¶¶ 26-27.

Around the same time, Fitch began reviewing Horsetail's Tickets and invoices. *Id.* ¶ 28. She found the invoices billed to DSP to be expensive and began to believe that DSP was "being overcharged for things that were not being provided and receiving poor service." *Id.* Further, she discussed Horsetail's services with deFreitas and David Citro, DSP's Information Security Manager. *Id.* Based on these conversations, Fitch began to form the opinion that DSP's IT services were "outdated, vulnerable, and being exposed to significant cybersecurity risks." *Id.*

Because of these concerns, Fitch retained Fayla to conduct an audit of DSP's IT system and provide her with advice concerning DSP's compliance with NCUA and FFIEC standards. *Id.* ¶ 32; *see* ECF 57-15 (11/15/2017 Fayla Report). According to Fitch, Fayla discovered numerous vulnerabilities with DSP's firewall and advised her that DSP's cybersecurity had significant gaps, leaving its IT system susceptible to breaches. *Id.* ¶ 37 (listing problems identified with the IT system of DSP's Georgetown Branch); *id.* ¶ 38 (listing problems identified with DSP's Server Room); *id.* ¶ 39 (listing problems identified with DSP's equipment).

For example, the audit revealed that Horsetail was providing DSP with three forms of duplicative internet service, *i.e.*, T1 Lines and DSL service by Verizon and Comcast. *Id.* ¶¶ 38, 67; ECF 57-15 at 3; ECF 57-24 at 79-81. Fitch believed that this was unnecessary, especially because DSP was also paying for Disaster Recovery. ECF 57-2, ¶ 67. Notably, Smith found one T1 line on the floor, completely disconnected. ECF 57-24 at 156-161, 282- 284. Fitch estimates

that DSP paid $30,000 per year for a backup internet line that served no purpose.  ECF 57-2, ¶ 68. And, at the time, DSP was paying Horsetail $721 per month for Predictive Network Maintenance Services, which includes internet monitoring.  ECF 57-10 at 2-6 (2017 monthly invoices); *see also* ECF 49-6 at 10-11 (11/1/2017 invoice).

In addition, Fayla could not locate any backup data dating back to at least 2016.  ECF 57-2, ¶ 43; ECF 57-15 at 3; ECF 54-24 at 34-36, 89.  However, the 2017 monthly invoices reflect that DSP paid $750 per month for "Backup and Recovery Service."  ECF 57-10 at 1, 3, 5.  In total, Fitch believes that DSP paid $18,000 for backup services that were not provided.  ECF 57-2, ¶ 2.

DSP contends that Horsetail knew of the audit.  ECF 57-1 at 10.  For instance, various Tickets created by DSP and handled by Horsetail include references to Smith and conversations between Horsetail staff and Smith or other Fayla employees.  *See* ECF 57-12 at 5-8 (12/11/2017 Ticket communication between Horsetail and Fayla engineers); *id.* at 9 (11/16/2017 Ticket referencing a call between Smith and Berman).  Likewise, Horsetail officers and employees emailed with Smith in an effort to assist Fayla in the audit.  *See* ECF 57-16 at 2 (11/5/2017 email from Burns to Fitch advising that if "auditor" cannot access a network, Fitch should call Horsetail for assistance); *id.* at 3 (11/13/2017 email from Berman to Smith providing Smith with Fitch's list of concerns); *id.* at 5 (11/13/2017 email from Horsetail engineer to Smith).

Based on the audit, Fitch concluded that DSP's IT system was "completely outdated and the hardware/software was prone to being compromised."  ECF 57-2, ¶ 33.  On December 1, 2017, Fitch sent an email to Berman and Smith outlining numerous issues with Horsetail's services.  ECF 57-18.  She stated, *id.*: "I have read the contract we have with Horsetail and I believe I am paying a monthly charge for disaster recovery."  Further, she expressed dissatisfaction that when she asked Horsetail to cancel the T1 line and provide backup services, Horsetail responded by submitting a

quote to charge DSP for these services.  *Id.*  Fitch wrote, *id.*: "I will not sign any documents for you. if you refuse to do the work, I will be forced to contact our attorneys regarding breach of contract."  Fitch avers that following this email exchange DSP's IT system became inoperative, which she found suspicious.  ECF 57-2, ¶ 71.

At his deposition, Smith testified that the same day, December 1, 2017, Berman called him while he was driving with Luis Lugo, a Fayla employee.  ECF 57-24 at 108-109.  According to Smith, Berman was "freaking out" about Horsetail's relationship with DSP.  *Id.* at 109.  Smith testified, *id.*: "[A]nd then he said, Tell me what—tell me what you need. Do I have to give you the firewalls at a discounted price? Do I have to write you a check? I just need that stuff signed by her and sent in and done."  Smith testified that he felt Berman was offering to give him "a kickback" to get Fitch to sign contracts with Horsetail.  *Id.* at 111.  "Immediately" following the conversation, Smith called Fitch to report what Smith had said.  *Id.* at 113.

Berman acknowledged during his deposition that he spoke with Smith over the phone in late November or December 2017 and Lugo was present.  ECF 57-21 at 14.  But, he denies offering to write Smith a check or entering into an arrangement concerning Horsetail's account with DSP.  *Id.* at 15.  Rather, he testified that he spoke with Smith "broadly" about Horsetail and Fayla collaborating on future projects.  *Id.*

As noted, in an email dated Friday, December 1, 2017, Fitch warned Berman that if Horsetail's provision of IT services to DSP did not improve, Fitch would "contact [DSP's] attorneys regarding breach of contract."  ECF 57-18 at 2.  Berman responded that Horsetail was "fully invested in helping to get [DSP] up to speed."  *Id.* at 3.  He stated that he would visit DSP in person the following Tuesday "and look[ed] forward to spending energy on our partnership and forward progress."  *Id.* at 4.

DSP terminated its relationship with Horsetail via letter dated January 29, 2018.  ECF 49-31 (the "Termination Letter").  The Termination Letter was addressed to Christopher Sasche from Mitchell Pollack Esq., of Mitchell Pollack & Associates PPLC, on behalf of DSP.  *Id.*  It stated, *id.*:

> My firm represents Delaware State Police Federal Credit Union (the "Credit Union") in connection with the Contract by and between the Credit Union and Horsetail Technologies, LLC ("Horsetail"), dated August 22, 2016 ("Contract"). This letter shall serve as a NOTICE OF TERMINATION under the Contract, for Horsetail's breach of its obligation to provide information technology-related services and solutions.
>
> Horsetail is in material breach of the Contract, since it has failed to provide the Credit Union with the services detailed in the Schedule of Services, and charged the Credit Union for services not authorized, as well as services not rendered. Further, among other things, Horsetail has failed to provide "Disaster Recovery" pursuant to the Contract and billed the Credit Union for an Image Center SQL Upgrade that was never authorized and never performed by Horsetail. These breaches have caused my client to suffer work disruptions in its operations, as well as other damages.
>
> Despite the repeated requests of the Credit Union to encourage Horsetail cure its material breaches, Horsetail remains in breach of the Contract. Therefore, the Credit Union has no alternative but to terminate the Contract, effective immediately.

Horsetail initiated this breach of contract action on February 23, 2018.  ECF 1.  DSP's Counterclaim followed on April 20, 2018.  ECF 9.

Additional facts are discussed, *infra*.

## II.     Legal Standards

### A.  Summary Judgment

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986); *see also Cybernet, LLC v. David*, 954 F.3d 162, 168 (4th Cir. 2020); *Variety Stores, Inc.*

*Wal-Mart Stores, Inc.*, 888 F.3d 651, 659 (4th Cir. 2018); *Iraq Middle Mkt. Dev. Found v. Harmoosh*, 848 F.3d 235, 238 (4th Cir. 2017).  To avoid summary judgment, the nonmoving party must demonstrate that there is a genuine dispute of material fact so as to preclude the award of summary judgment as a matter of law.  *Ricci v. DeStefano*, 557 U.S. 557, 585-86 (2009); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986); *see also Gordon v. CIGNA Corp.*, 890 F.3d 463, 470 (4th Cir. 2018).

The Supreme Court has clarified that not every factual dispute will defeat a summary judgment motion.  "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.* at 248.

There is a genuine issue as to material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*; *see CTB, Inc. v. Hog Slat, Inc.*, 954 F.3d 647, 658 (4th Cir. 2020); *Variety Stores, Inc.*, 888 F.3d at 659; *Sharif v. United Airlines, Inc.*, 841 F.3d 199, 2014 (4th Cir. 2016); *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013).  On the other hand, summary judgment is appropriate if the evidence "is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 252.  But, "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.*

 "A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [her] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514,

522 (4th Cir. 2003) (quoting former Fed. R. Civ. P. 56(e)), *cert. denied*, 541 U.S. 1042 (2004); *see also Celotex*, 477 U.S. at 322-24.  And, the court must view all of the facts, including reasonable inferences to be drawn from them, in the light most favorable to the nonmoving party.  *Ricci*, 557 U.S. at 585-86; *Matsushita Elec. Indus. Co.*, 475 U.S. at 587; *accord Hannah P. v. Coats*, 916 F.3d 327, 336 (4th Cir. 2019); *Variety Stores, Inc.*, 888 F.3d at 659; *Gordon*, 890 F.3d at 470; *Lee v. Town of Seaboard*, 863 F.3d 323, 327 (4th Cir. 2017); *FDIC v. Cashion*, 720 F.3d 169, 173 (4th Cir. 2013).

The district court's "function" is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Anderson*, 477 U.S. at 249; *accord Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 216 (4th Cir. 2016).  Thus, in considering a summary judgment motion, the court may not make credibility determinations.  *Wilson v. Prince George's Cty.*, 893 F.3d 213, 218-19 (4th Cir. 2018);  *Jacobs v. N.C. Administrative Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015); *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007).  Therefore, in the face of conflicting evidence, such as competing affidavits, summary judgment ordinarily is not appropriate, because it is the function of the fact-finder to resolve factual disputes, including matters of witness credibility.  *See Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis v. Columbia Colleton Med. Ctr., Inc*., 290 F.3d 639, 644-45 (4th Cir. 2002).  That said, "a party's 'self-serving opinion ... cannot, absent objective corroboration, defeat summary judgment.'"  *CTB, Inc*., 954 F.3d at 658-59 (quoting *Williams v. Giant Food Inc.,* 370 F.3d 423, 433 (4th Cir. 2004)).  In other words, "[u]nsupported speculation is not sufficient to defeat a summary judgment motion."  *Felty v. Graves-Humphreys Co*., 818 F.2d 1126, 1128 (4th Cir. 1987); accord ); *Harris v. Home Sales Co*., 499 F. App'x 285, 294 (4th Cir. 2012).

When, as here, the parties have filed cross-motions for summary judgment, the court "'consider[s] each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law.'" *Def. of Wildlife v. N.C. Dep't of Transp*., 762 F.3d 374, 392 (4th Cir. 2014) (citation omitted). In doing so, the court "'resolve[s] all factual disputes and any competing, rational inferences in the light most favorable to the party opposing that motion.'" *Id.* at 393 (quoting *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003), *cert. denied*, 540 U.S. 822 (2003)); *see Mellen v. Bunting*, 327 F.3d 355, 363 (4th Cir. 2003).

Simply because both parties have filed for summary judgment does not mean that summary judgment to one party or another is necessarily appropriate. Rather, "[b]oth motions must be denied if the court finds that there is a genuine issue of material fact." 10A C. WRIGHT, A. MILLER, & M. KANE, FEDERAL PRACTICE & PROCEDURE § 2720 (4th ed. Suppl. 2020) (WRIGHT & MILLER).

### B.  Choice of Law

As noted, jurisdiction is based on diversity of citizenship. ECF 1, ¶ 9; *see* 28 U.S.C. § 1332. When a federal court sits in diversity, it must "apply the forum state's substantive laws, including its choice of law rules." *Small v. WellDyne, Inc*., 927 F.3d 169, 173 n.3 (4th Cir. 2019); *see Francis v. Allstate Ins. Co*., 709 F.3d 362, 369 (4th Cir. 2013); *CACI Int'l, Inc. v. St. Paul Fire & Marine Ins. Co*., 566 F.3d 150, 154 (4th Cir. 2009); *Colgan Air, Inc. v. Raytheon Aircraft Co*., 507 F.3d 270, 275 (4th Cir. 2007); see also WRIGHT & MILLER, § 4501. Maryland is, of course, the forum state.

Under Maryland's choice-of-law principles for contract claims, Maryland applies the rule of *lex loci contractus*, applying the substantive law of the state where the contract was formed, unless there is a choice-of-law provision in the contract. *Erie Ins. Exch. v. Heffernan*, 399 Md. 598, 925 A.2d 636, 648-49 (2007); *Am. Motorists Ins. Co. v. ARTRA Group, Inc.*, 338 Md. 560,

573, 659 A.2d 1295, 1301 (1995); *see also Cunningham v. Feinberg*, 441 Md. 310, 326, 107 A.3d 1194, 1204 (2015); *Lewis v. Waletzky*, 422 Md. 647, 657 n.8, 31 A.3d 123, 129 n.8 (2011). Here, the parties agree that Maryland law governs the various agreements. ECF 49-1 at 20-21; ECF 57-1 at 38. And, the 2012 Services Agreement and the Master Services Agreement both contain Maryland choice of law clauses. *See* ECF 49-4 at 11; ECF 49-14 at 5. Accordingly, I will apply Maryland law in assessing the parties' breach of contract claims.

### C.  Principles of Maryland Contract Law

Both Horsetail and DSP contend that the other is liable breach of contract. ECF 1; ECF 9. Therefore, it is helpful to review the principles of contract formation and the claim for breach of contract under Maryland law.

In general, a contract is defined as "a promise or set of promises for breach of which the law gives a remedy, or the performance of which the law in some way recognizes as a duty." RICHARD A. LORD, 1 WILLISTON ON CONTRACTS § 1:1 (4th ed. 1990); *accord* RESTATEMENT (SECOND) CONTRACTS § 1 (1981); *see also Maslow v. Vanguri*, 168 Md. App. 298, 321, 896 A.2d 408, 421-22, *cert. denied*, 393 Md. 478, 903 A.2d 416 (2006). "'A contract is formed when an unrevoked offer made by one person is accepted by another.'" *Cty. Comm'rs for Carroll Cty. v. Forty W. Builders, Inc.*, 178 Md. App. 328, 377, 941 A.2d 1181, 1209 (2008) (quoting *Prince George's Cty. v. Silverman*, 58 Md. App. 41, 57, 472 A.2d 104, 112 (1984)). Thus, mutual assent is an integral component of every contract. *See, e.g.*, *Joseph Saveri Law Firm Inc. v. Michael E. Criden, P.A.*, 759 F. App'x 170, 173 (4th Cir. 2019) (recognizing as a "bedrock principle of law" that an offeree must accept an offer to form a contract); *Cochran v. Norkunas*, 398 Md. 1, 14, 919 A.2d 700, 708 (2007); *Advance Telecom Process LLC v. DSFederal, Inc.*, 224 Md. App. 164, 177, 119 A.3d 175, 183 (2015).

In determining whether there is an enforceable contract, courts begin the analysis "by discussing the essential prerequisite of mutual assent to the formation of a contract . . . ." *Falls Garden Condo. Ass'n, Inc. v. Falls Homeowners Ass'n, Inc.*, 441 Md. 290, 302, 107 A.3d 1183, 1189 (2015); *see also Mitchell v. AARP*, 140 Md. App. 102, 116, 779 A.2d 1061, 1069 (2001) ("An essential element with respect to the formation of a contract is 'a manifestation of agreement or mutual assent by the parties to the terms thereof; in other words, to establish a contract the minds of the parties must be in agreement as to its terms.'" (citations omitted)). "Manifestation of mutual assent includes two issues: (1) intent to be bound, and (2) definiteness of terms." *Cochran*, 398 Md. at 14, 919 A.2d at 708.

A contract may be oral or written, as well as express or implied. "'An express contract has been defined as an actual agreement of the parties, the terms of which are openly uttered or declared at the time of making it, being stated in distinct and explicit language, either orally or in writing.'" *Md. Cas. Co. v. Blackstone Int'l Ltd.*, 442 Md. 685, 706, 114 A.3d 676, 688 (2015) (quoting *Cty. Comm'rs of Caroline Cty v. Roland Dashiell & Sons, Inc.*, 358 Md. 83, 94, 747 A.2d 600, 606 (2000)). Whether oral or written, a contract must express with certainty the nature and extent of the parties' obligations and the essential terms of the agreement. *Forty W. Builders*, 178 Md. App. at 377-78, 941 A.2d at 1209-10; *see Canaras v. Lift Truck Servs.*, 272 Md. 337, 346, 322 A.2d 866, 871 (1974). An agreement is not enforceable if it omits an important term or is otherwise too vague or indefinite with respect to an essential term. *Mogavero v. Silverstein*, 142 Md. App. 259, 272, 790 A.2d 43, 51 (2002); *see L&L Corp. v. Ammendale*, 248 Md. 380, 385, 236 A.2d 734, 737 (1967); *Schloss v. Davis*, 213 Md. 119, 123, 131 A.2d 287, 290 (1956) (stating that a "contract may be so vague and uncertain as to price or amount as to be unenforceable").

"'The cardinal rule of contract interpretation is to give effect to the parties' intentions.'"
*Dumbarton Imp. Ass'n. Inc. v. Druid Ridge Cemetery Co.*, 434 Md. 37, 51, 73 A.3d 224, 232
(2013) (citation omitted).  To determine the parties' intention, courts look first to the written
language of the contract.  *Walton v. Mariner Health of Md., Inc.*, 391 Md. 643, 660, 894 A.2d 584,
594 (2006) ("[G]enerally, when seeking to interpret the meaning of a contract our search is limited
to the four corners of the agreement."); *Hartford Acc. & Indem. Co. v. Scarlett Harbor Assoc. Ltd.
P'ship*, 109 Md. App. 217, 291, 674 A.2d 106, 142 (1996) ("[T]he court must, as its first step,
determine from the language of the agreement what a reasonable person in the position of the
parties would have meant at the time the agreement was effectuated."), *aff'd,* 346 Md. 122, 695
A.2d 153 (1997).

Maryland adheres to the objective method of contract interpretation, which specifies that
"'the written language embodying the terms of an agreement will govern the rights and liabilities
of the parties, irrespective of the intent of the parties at the time they entered into the contract.'"
*Sy-Lene of Wash., Inc. v. Starwood Urban Retail ll, LLC*, 376 Md. 157, 166, 829 A.2d 540, 545
(2003) (citation omitted); *see Cochran*, 398 Md. at 16, 919 A.2d at 709; *Huggins v. Huggins &
Harrison, Inc.*, 220 Md. App. 405, 417, 103 A.3d 1133, 1139 (2014); *accord Parkway 1046, LLC
v. U.S. Home Corp.*, ___ F.3d ___, 2020 WL 2892224, at *4 (4th Cir. June 3, 2020).  The court's
task is thus not to imagine what the parties' intended at the time of the agreement but to "'determine
from the language of the agreement itself what a reasonable person in the position of the parties
would have meant at the time it was effectuated.'"  *Dumbarton*, 434 Md. at 52, 73 A.3d at 232
(quoting *Gen. Motors Acceptance v. Daniels,* 303 Md. 254, 261, 492 A.2d 1306, 1310 (1985)).
Notably, under Maryland law, the interpretation of a contract is "ordinarily a question of law for

the court." *Grimes v. Gouldmann*, 232 Md. App. 230, 235, 157 A.3d 331, 335 (2017); *see also Spacesaver Sys., Inc. v. Adam*, 440 Md. 1, 7, 98 A.3d 264, 268 (2014).

"Generally, a breach of contract is defined as a 'failure, without legal excuse, to perform any promise that forms the whole or part of a contract.'" *Weaver v. ZeniMax Media, Inc*., 175 Md. App. 16, 51, 923 A.2d 1032 (2007) (citing WILLISTON ON CONTRACTS § 63:1). Under Maryland law, the elements of a claim for breach of contract are "'contractual obligation, breach, and damages.'" *Tucker v. Specialized Loan Servicing, LLC*, 83 F.Supp.3d 635, 655 (D. Md. 2015) (quoting *Kumar v. Dhanda*, 198 Md. App. 337, 17 A.3d 744, 749 (2011)). To "prevail in an action for breach of contract, a plaintiff must prove that the defendant owed the plaintiff a contractual obligation and that the defendant breached that obligation." *Taylor v. NationsBank, N.A*., 365 Md. 166, 175, 776 A.2d 645, 651 (2001); *accord Belyakov v. Med. Sci. & Computing*, 86 F. Supp. 3d 430, 437 (D. Md. 2015); *see also RRC Ne., LLC v. BAA Md., Inc*., 413 Md. 638, 658, 994 A.2d 430, 442 (2010). In other words, "[i]t is the parties' agreement that ultimately determines whether there has been a breach." *Mathis v. Hargrove*, 166 Md. App. 286, 318-19, 888 A.2d 377, 396 (2005).

In *Polek v. J.P. Morgan Chase Bank, N.A*., 424 Md. 333, 362, 36 A.3d 399, 416 (2012), the Maryland Court of Appeals said: "Maryland law requires that a plaintiff alleging a breach of contract 'must of necessity allege with certainty and definiteness *facts* showing a contractual obligation owed by the defendant to the plaintiff and a breach of that obligation by defendant.'" (citation omitted) (emphasis *in Polek*); *see also Robinson v. GEO Licensing Co., LLC*, 173 F. Supp. 2d 419, 423 (D. Md. 2001).

To establish an anticipatory breach of contract, "there must be a definite, specific, positive, and unconditional repudiation of the contract by one of the parties to the contract.'" *J.E. Dunn*

*Const. Co. v. S.R.P. Dev. Ltd. P'ship*, DKC-11-1948, 2014 WL 3865993, at *5 (D. Md. Aug. 5, 2014) (quoting *C.W. Blomquist & Co., Inc. v. Capital Area Realty Inv'rs Corp.*, 270 Md. 486, 494, 311 A.2d 787 (1973)); see *also BVR Dev., LLC v. CalAtlantic Grp., Inc.*, ADC-18-2039, 2019 WL 919560, at *7 (D. Md. Feb. 25, 2019).   Indeed, Maryland law recognizes that "when 'in anticipation of the time of performance one definitely and specifically refuses to do something which he is obligated to do, so that it amounts to a refusal to go on with the contract, it may be treated as a breach by anticipation, and the other party may, at his election, treat the contract as abandoned, and act accordingly.'" *C.W. Blomquist & Co*., 270 Md. at 494, 311 A.2d at 791 (quoting *Friedman v. Katzner*, 139 Md. 195, 114 A. 884, 887 (1921)).

### III.    Discussion

Horsetail argues that it is entitled to summary judgment as to DSP's liability under the 2012 Email Agreement, the 2013 Technology Agreement, the Master Services Agreement, the 2017 SBA, and the 2017 SQL Agreement.  ECF 49-1 at 21.  According to Horsetail, the "undisputed facts" establish that DSP "owed Horsetail separate contractual obligations" under each agreement, all of which DSP breached when it terminated the relationship in January 2018. *Id.*  Horsetail also asks the Court to grant summary judgment on its request for damages because the "undisputed facts" show that it "suffered and continues to suffer direct damages as a result of DSP's breaches, and that these direct damages are easily quantifiable." *Id.*  Further, Horsetail seeks summary judgment on DSP's Counterclaim, asserting that it did not breach any of the contracts, DSP's damages theory is untenable under Maryland law, and DSP is not entitled to declarations that it validly terminated the agreements. *See id.* at 29-34.

In response, DSP argues that summary judgment is inappropriate as to the Master Services Agreement and the 2017 contracts.  ECF 57-1 at 24-33, 36-37.  DSP contends that there are genuine

issues of material fact as to whether the documents purporting to be the Master Services Agreement and the Supplemental TOS are authentic and whether Jackson had authority to enter into the contract on DSP's behalf.  ECF 57-1 at 35-37.  Moreover, DSP argues that it is a triable issue whether Horsetail breached the Master Services Agreement and 2017 contracts.  *See id.* Independently, DSP moves for summary judgment as to the 2012 Services Agreement, the 2012 Email Agreement, and the 2013 Technology Agreement, on the ground that those contracts are either expired, superseded, or terminated.  *Id.* at 39-42.

## A.  Finch Affidavit

As a preliminary matter, the parties strenuously debate the admissibility of Finch's Affidavit (ECF 57-2).  *See* ECF 58 at 4-8; ECF 59 at 4-15.  As Horsetail puts it, the Finch Affidavit "could be the subject of a complicated evidence class final exam."  ECF 58 at 3.  According to Horsetail, "[n]early every paragraph" in the Fitch Affidavit "suffers from multiple evidentiary infirmities layered on top of each other, and often times relying on documents that are themselves inadmissible."  *Id.*  Indeed, Horsetail objects to all but a handful of the 125 paragraphs contained in the Affidavit, deeming it necessary to create a "Table of Objections" identifying the defects with each of Finch's statements.  *Id.* at 5; *see* ECF 58-1 (Table of Objections).  For instance, Horsetail maintains that over 100 paragraphs in the Finch Affidavit are not premised on personal knowledge. ECF 58 at 6.  It also objects to paragraphs in the Affidavit on the grounds that they contain hearsay, constitute legal conclusions, are irrelevant, violate the parol evidence rule, or trigger the sham affidavit rule.  *See* ECF 58-1.

DSP counters that the Fitch Affidavit "is offered to provide background information," and stresses that Fitch's statements are "supported by her own deposition testimony and/or the deposition testimony of others as well as Helpdesk service tickets; emails; invoices; contracts; and

other documents in [DSP's] possession." ECF 59 at 8-9. DSP then proceeds to defend the admissibility of specific statements in the Fitch Affidavit in painstaking detail. *Id.* at 10-15. And, to the extent that the Court disregards the Fitch Affidavit, DSP argues that the Court must decline to consider various statements contained in the affidavits of Berman, Christopher Sasche, and Travis Sasche. *Id.* at 9-10.

Under Federal Rule of Civil Procedure 56(c)(1), a party may support its position on summary judgment "by citing to particular parts of materials in the record" or, alternatively, by showing that the "adverse party cannot produce admissible evidence to support the fact." *See, e.g.*, *Whittaker v. Morgan State Univ.*, 524 F. App'x 58 (4th Cir. 2013) (per curiam) (affirming grant of summary judgment where plaintiff's sole evidence was an unauthenticated letter). It follows that an "affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4); *see Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 962 (4th Cir. 1996) (observing that "summary judgment affidavits cannot be conclusory or based upon hearsay"); WRIGHT & MILLER § 2721.

Therefore, "under Rule 56(c), a court may strike portions of affidavits that contain legal or factual argument, are not based on personal knowledge, contain hearsay, or rest on conclusory statements." *Glass v. Anne Arundel Cty.*, 38 F. Supp. 3d 705, 712 (D. Md. 2014); *see also Mott v. Accenture, LLP*, PX-17-CV-00231, 2019 WL 1934727, at *9-10 (D. Md. Apr. 29, 2019). That said, courts should employ a scalpel, not a hacksaw, to excise inadmissible statements from an affidavit. *See Upshaw v. Ford Motor Co.,* 576 F.3d 576, 593 (6th Cir. 2009).

Having waded through Horsetail's voluminous objections, I find no basis to strike the Fitch Affidavit. I begin with Horsetail's contention that the Court should ignore 93 paragraphs contained

in the Finch Affidavit because those statements do not rest on Fitch's personal knowledge.  *See* ECF 58 at 6-8;  ECF 58-1.  Fitch has served as the CEO of DSP since October 2017.  ECF 57-2, ¶ 4.  Before that, Fitch was the CEO of another federal credit union.  *Id.*  As CEO of DSP, Fitch "oversee[s] all of the operations, negotiate[s] contracts with vendors, make[s] planning and budgeting decisions, and supervise[s] all of the Credit Union's employees."  *Id.* ¶ 5.  These duties encompass "overseeing and making all decisions related to the [IT] utilized in the Credit Union's operations."  *Id.* ¶ 6.

In light of Fitch's background, the Court finds that it is reasonable to infer that she is familiar with the IT services utilized by federal credit unions. This is especially so given the "critical" role that IT services play in ensuring banking efficiency and consumer protection.  *Id*. Moreover, given her position at DSP, Fitch has personal knowledge of the IT services that Horsetail was providing to DSP and can speak to her interactions with Horsetail and Fayla.

Likewise, Fitch can speak to documents that she reviewed. An "'affiant's personal knowledge may be based on review of files, if the testimony states facts reflected by the files and does not give 'inferences, opinions and surmises.'" *Sanchez Carrera v. EMB Sales, Inc.*, 402 F. Supp. 3d 128, 140 (D. Md. 2019) (citation omitted); s*ee United States ex rel. Netplanner Sys., Inc. v. GSC Constr. Inc.*, No. 5:17-CV-00154-BR, 2017 WL 3594261, at *3 (E.D.N.C. Aug. 21, 2017) (declining to strike general counsel's affidavit based on review of records and collecting cases). Moreover, Fitch is the custodian of records at DSP.  ECF 57-2, ¶ 125.  Therefore, Fitch can address the various emails, Tickets, reports, and agreements exchanged between DSP, Horsetail, and Fayla that she has reviewed in her capacity as DSP's CEO.  Thus, the Court declines to strike portions of the Fitch Affidavit for lack of personal knowledge, although the Court will not give any consideration to Fitch's opinions concerning the various agreements.

Horsetail's hearsay objections are equally without merit.  To be sure, it is well established that "summary judgment affidavits cannot be conclusory or based upon hearsay."  *Evans*, 80 F.3d at 962.  The flaw in Horsetail's argument is that when ruling on a motion for summary judgment, the court need only determine if the nonmoving party can produce admissible evidence *at trial* regarding a materially disputed factual issue.  *See* Fed. R. Civ. P. 56(c)(2).  Thus, the Fourth Circuit has recognized that a court may consider "otherwise inadmissible materials" on summary judgment so long as "it will be possible to put the information . . . into an admissible form." *Humphreys & Partners Architects, L.P. v. Lessard Design, Inc*., 790 F.3d 532, 538 (4th Cir. 2015); *see Lee v. Offshore Log. & Transp., LLC*, 859 F.3d 353, 354-56 (5th Cir. 2017); *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1293-94 (11th Cir. 2012); *Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003); *Kurland v. ACE Am. Ins. Co*., JKB-15-2668, 2017 WL 354254, at \*3 n.2 (D. Md. Jan. 23, 2017); WRIGHT & MILLER § 2738.

Here, it is possible to reduce the alleged hearsay statements contained in Fitch Affidavit to an admissible form: in-court testimony by the individuals who made the statements summarized by Fitch, such as deFreitas, Berman, and Smith.  Indeed, for the same reason, the Court need not cast aside the many hearsay statements contained in the affidavits supplied by Horsetail in support of the Horsetail Motion.  *See, e.g.*, ECF 49-3, ¶ 8-9; ECF 49-12, ¶¶ 6-7, 9, 11-13.

Horsetail's effort to strike parts of Fitch's Affidavit as a sham affidavit is likewise unavailing.  Under the sham affidavit rule, a court may disregard statements in an affidavit that conflict with the declarant's deposition testimony.  *See Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795 (1999); *Williams v. Genex Servs., LLC*, 809 F.3d 103, 110 (4th Cir. 2015); *In re Family Dollar FLSA Litig*., 637 F.3d 508, 512 (4th Cir. 2011).  In order to avoid infringing upon the province of the fact finder, application of the sham affidavit rule at the summary judgment stage

must be carefully limited to situations involving flat contradictions of material fact. *See Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 185 n.7 (4th Cir. 2001) (observing that the rule only applies where there is "a bona fide inconsistency" between an affiant's averments and his deposition testimony); *Zimmerman v. Novartis Pharm. Corp.*, 287 F.R.D. 357, 362 (D. Md. 2012) ("Application of the sham affidavit rule at the summary judgment stage 'must be carefully limited to situations involving flat contradictions of material fact.'") (citation omitted).

In its submissions, Horsetail identifies only one inconsistency between the Fitch Affidavit and her testimony. ECF 58 at 16. Specifically, it contends that when Fitch was asked during her deposition if Jackson had authority to enter the Master Services Agreement, Fitch responded, "I don't know." ECF 58-2 at 3. This answer is apparently contradicted by the statement in her Affidavit, asserting: "I was told that [DSP] only authorized its CEO to enter into contracts . . . ." ECF 57-2, ¶ 9.

I agree that the statements are somewhat inconsistent and could provide material for cross-examination of Fitch. But, Fitch's statements are not entirely different. Taken together, the statements convey that Fitch does not know for a fact whether Jackson had authority to enter into contracts with Horsetail, but she had heard that only the CEO had such authority. Accordingly, Fitch's deposition and Affidavit are not so clearly inconsistent as to trigger the sham affidavit rule.

Finally, in its "Table of Objections," Horsetail objects to 12 paragraphs in the Fitch Affidavit on the basis that the statements violate the parol evidence rule. *See* ECF 58-1. However, in its brief (ECF 58), Horsetail fails to expound on this argument. *See* ECF 58 at 4 (averring generally that Fitch's statements "regarding Horsetail's contractual obligations often conflict with the unambiguous language in the contracts, violating the parol evidence rule"). Undeveloped and perfunctory arguments are deemed waived. *See Belk, Inc. v. Meyer Corp.*, 679 F.3d 146, 152 n.4

(4th Cir. 2012) (holding that an issue was waived when a party included it in a heading, but did not otherwise develop the argument); *Long v. Teachers Ret. Sys.*, 585 F.3d 344, 349 (7th Cir. 2009) ("Unsupported and undeveloped arguments are waived."); *accord Lab. Corp. of Am. Holdings v. Kearns*, 84 F. Supp. 3d 447, 459-60 (M.D.N.C. 2015).  Consequently, I decline to undertake the laborious task of applying the parol evidence rule to Fitch's various statements when Horsetail failed to do the work itself.

In sum, having completed the law school exam that Horsetail created for the Court, I am satisfied that the Fitch Affidavit is not plagued by inadmissible statements.  Accordingly, although I will not consider those paragraphs that are purely argumentative, I shall not strike the submission.

### B.  The Contracts

As noted, Horsetail moves for summary judgment as to DSP's liability under the 2012 Email Agreement, the 2013 Technology Agreement, the Master Services Agreement, the 2017 SBA, and the 2017 SQL Agreement.  ECF 49-1 at 21. DSP opposes summary judgment as to the Master Services Agreement and the 2017 contracts while pursuing summary judgment under the 2012 Services Agreement, the 2012 Email Agreement, and the 2013 Technology Agreement.  ECF 57-1 at 36-42.

I examine, in turn, the parties' contentions regarding each contract.

### I.      The 2012 Services Agreement

DSP seeks summary judgment regarding its liability under the 2012 Services Agreement on the ground that there is no genuine issue of material fact that it timely paid all monies owed under the contract, which was superseded in 2016 by the Master Services Agreement.  ECF 57-1 at 40.  Horsetail does not oppose DSP's request, observing that it "does not seek damages" under the 2012 Services Agreement and only brings it to the Court's attention because its terms apply to the 2012 Email Agreement.  *See* ECF 58 at 8 n.5.  Because the parties are on the same page, the

Court will grant DSP's request for summary judgment as to its liability under the 2012 Services Agreement.

## II. The 2012 Email Agreement

Horsetail moves for summary judgment as to DSP's liability under the 2012 Email Agreement. ECF 49-1 at 21-22. Horsetail asserts that there is no genuine dispute that DSP and Horsetail executed the 2012 Email Agreement in February 2012, and that DSP agreed to automatic 12-month renewals every February 15. *Id.* Because DSP did not expressly terminate the 2012 Email Agreement on either February 15, 2018 or February 15, 2019, Horsetail posits that the contract is valid through March 15, 2020. *Id.* at 22. Therefore, Horsetail contends that DSP breached the 2012 Email Agreement when it ceased paying Horsetail's invoices in November 2017, and it owes DSP more than $20,175. *See id.* at 4-5, 22-23.

DSP, too, moves for summary judgment under the 2012 Email Agreement. ECF 57-1 at 41. According to DSP, the 2012 Email Agreement unambiguously states that it is a "'3 year agreement'" and therefore it expired pursuant to its own terms on February 7, 2012. *Id.* (quoting ECF 49-7). Because there is no dispute that DSP paid all monthly invoices through February 2012, DSP maintains that it long ago discharged its obligations under the 2012 Email Agreement. *See id.* at 41-42; ECF 59 at 16. Alternatively, DSP contends that, following the initial term of the 2012 Email Agreement, it was extended on a month-to-month basis and therefore DSP validly terminated the contract through its Termination Letter in 2018. ECF 59 at 16.

As the parties' arguments illustrate, the crux of the dispute surrounding the 2012 Email Agreement is whether it expired in 2015 or was extended and, if so, what terms apply to the extensions. The 2012 Email Agreement provides that it is "an addendum" to the 2012 Services Agreement and is governed by the terms and conditions of that contract, "except term." ECF 49-

7. With respect to its term, the 2012 Email Agreement provides that it is a "3 year agreement paid monthly." *Id.* Therefore, under the plain language of the contract, the 2012 Email Agreement expired on February 7, 2015, three years after it was executed by Jackson on behalf of DSP. *Id.*

Horsetail does not quarrel with the express terms of the 2012 Email Agreement. Instead, it contends that Jackson entered into a verbal agreement with Christopher Sachse at the conclusion of the 3-year term, by which the 2012 Email Agreement would "automatically renew[] for successive 12-month periods . . . unless either party gave notice of its intention to terminate." ECF 49-3, ¶ 9; *see* ECF 58 at 8. In this regard, Horsetail observes that DSP paid for all email security services provided by Horsetail from February 2015 until November 2017. ECF 49-6, ¶¶ 5-6.

DSP questions the veracity of C. Sachse's statement that Jackson entered into a verbal agreement with him, pointing out that Jackson testified at her deposition that DSP "didn't have verbal contracts." ECF 49-10 at 2. DSP also argues that a verbal agreement to extend the 2012 Email Agreement would be ineffectual because the 2012 Services Agreement provides that it may be "'amended only by a writing signed by each of the parties.'" ECF 59 at 16 (quoting ECF 49-4 at 11) (emphasis omitted).

It is a "well settled rule" of Maryland contract law "that the parties by their conduct may waive the requirements of a written contract." *Universal Nat'l Bank v. Wolfe*, 279 Md. 512, 522 (1977); *see Hovnanian Land Inv. Grp., LLC v. Annapolis Towne Centre at Parole, LLC*, 421 Md. 94, 120, 25 A.3d 967, 982 (2011) ("[O]ur case law shows a persistent unwillingness to give dispositive and preclusive effect to contractual limitations on future changes to that contract."); *accord Galloway v. Santander Consumer USA, Inc.*, 819 F.3d 79, 88 (4th Cir. 2016). And, Maryland law permits parties orally to modify a written contract, notwithstanding the existence of a written modification clause. *See, e.g.*, *Chesapeake Supply & Equip. v. Manitowoc Eng'g*

*Corp.*, 232 Md. 555, 566, 194 A.2d 624, 630 (1963); *Freeman v. Stanbern Const. Co.*, 205 Md. 71, 106 A.2d 50 (1954).  Thus, parties to a written contract can impliedly modify a written contract through conduct or modify the contract expressly through an oral agreement.

However, a party must establish the validity of a subsequent oral modification of a written agreement by a preponderance of the evidence.  *Richard F. Kline, Inc. v. Shook Excavating & Hauling, Inc.*, 165 Md. App. 262, 277-78, 885 A.2d 381, 390 (2005) (citing *Freeman*, 205 Md. at 79, 106 A.2d 50).  And, "'whether subsequent conduct of the parties amounts to a modification or waiver of their contract is generally a question of fact to be decided by the trier of fact.'" *Hovnanian*, 421 Md. at 122, 25 A.3d at 983 (citation omitted).   In considering whether waiver or modification of a contract has occurred, courts "look to the totality of a party's actions." *Id.* Because this inquiry is fact intensive, "it is an uncommon case in which the issue can be resolved by summary judgment." *Id.*

Application of these principles here precludes granting summary judgment on the 2012 Email Agreement in favor of either party.[4]  To be sure, according to the express terms of the contract, it expired on February 7, 2015.  And, DSP is correct that the written modification clause in the 2012 Service Agreement extends to the 2012 Email Agreement.  However, the parties' conduct does not indicate that the contract expired in 2015.  Between 2015 and October 2017, Horsetail billed DSP for email security services, and DSP timely paid these invoices. *See* ECF 49-6, ¶ 5; ECF 57-10 at 2-6.  That behavior is consistent with an extension of the contract.

---

[4] Because I deny summary judgment to both parties on the ground that there is a genuine dispute of material fact concerning the parties' modification of the 2012 Email Agreement in 2015, I take no position concerning DSP's arguments that Horsetail's poor performance was a material breach of the contract or that the Termination Letter constitutes a valid termination of the 2012 Email Agreement. *See* ECF 57-1 at 19-20; ECF 59 at 17-18.

That said, to the extent that the parties extended the 2012 Email Agreement, there is a genuine dispute of material fact as to the contract's renewal terms. Horsetail asserts that the 2012 Email Agreement automatically renewed each March for a period of 12 months, relying on Christopher Sachse's sworn statement that he and Jackson orally agreed to this term. *See* ECF 58 at 9; *see also* ECF 49-3, ¶ 9. On the other hand, DSP contends that no such agreement occurred, highlighting that Jackson admitted during her deposition that DSP did not recognize oral contracts. *See* ECF 59 at 16; *see also* ECF 49-10 at 2.

The existence of this oral agreement is quintessentially a factual dispute. *See Power Servs., Inc. v. MCI Constructors, Inc.*, 3 F. App'x 190, 191-93 (4th Cir. 2001) (per curiam) (recognizing that factual disputes concerning oral agreement precluded summary judgment). And, it is material because it goes to whether DSP breached the 2012 Email Agreement. If Jackson and C. Sachse had an oral agreement, then Horsetail can argue that DSP breached the 2012 Email Agreement when it stopped paying for email security services in October 2017. On the other hand, in the absence of an oral modification, DSP has a compelling argument that the parties' conduct reflects an agreement to extend the 2012 Email Agreement on a month-to-month basis, given that Horsetail invoiced DSP on a monthly basis. Of course, whether the parties' conduct amounts to a modification of the contract is also a question for the fact finder. *See Hovnanian*, 421 Md. at 122, 25 A.3d at 983.

In sum, there is a triable issue as to the terms of the 2012 Email Agreement. Therefore, neither party is entitled to summary judgment. *See, e.g.*, *Parcel Delivery Express, Inc.*, v. Volpe Express, Inc., JMC-17-02418, 2018 WL 1898263, at *3 (D. Md. Apr. 20, 2018) (denying summary judgment where factual issues pervaded the terms of contract modified by conduct); *TBC, Inc. v. DEI Sales, Inc.*, CCB-14-3644, 2017 WL 4151261, at *6 (D. Md. Sept. 19, 2017) (same).

III. The 2013 Technology Agreement

Regarding the 2013 Technology Agreement, Horsetail asserts that it is entitled to summary judgment as to DSP's liability.  Horsetail maintains that Jackson executed the contract on DSP's behalf in 2013 and, after the expiration in 2016 of the initial 3-year term, DSP renewed the contract by retaining the technology and paying discounted invoices.  ECF 49-1 at 23.  According to Horsetail, DSP breached the 2013 Technology Agreement because the Termination Letter does not reference the contract and DSP still possesses the equipment that is the subject of the contract. *Id.*; *see* ECF 58 at 12.

DSP likewise moves for summary judgment as to the 2013 Technology Agreement.  ECF 57-1 at 41-42.  Although DSP questions the authenticity of the unsigned document furnished by Horsetail, it primarily argues that the 2013 Technology Agreement expired under its own terms on June 1, 2016.  *Id.* at 41.  In opposing the Horsetail Motion, DSP focuses its firepower on the renewal of the 2013 Technology Agreement, arguing that there are factual disputes concerning whether the parties agreed that DSP would lease the equipment, as opposed to purchasing it.  ECF 59 at 18-22.

Genuine issues of material fact surround the modification of the 2013 Technology Agreement and Horsetail's performance, thus precluding summary judgment in favor of either Horsetail or DSP.  To be sure, there is no genuine dispute that DSP and Horsetail entered into an agreement in 2013, whereby Horsetail would supply DSP with switches, routers, and bandwidth monitors.  Although the document purporting to be the 2013 Technology Agreement is not executed, *see* ECF 49-9, other evidence confirms the existence of the contract.

Berman recalls having seen a version of the 2013 Technology Agreement executed by Jackson.  ECF 49-12, ¶ 3.  And, Jackson testified that she "believes" that she executed a written

contract with Horsetail concerning technology services. *See* ECF 49-10 at 2. Although she does not recall executing the agreement, she testified that Horsetail did in fact provide the contracted equipment. ECF 59-3 (Jackson Deposition) at 7-8, 11. Moreover, Horsetail's conduct manifests acceptance of the 2013 Technology Agreement. DSP paid an invoice on May 3, 2013, for switches, routers, and bandwidth monitoring, the same products and services included in the 2013 Technology Agreement. *Compare* ECF 49-8, *with* ECF 49-10 at 8. Notably, the invoice was for $9,660, which is the same amount as the "First Month Charges" specified in the 2013 Technology Agreement. *See id.* Therefore, the existence of the 2013 Technology Agreement is beyond dispute.

There is, however, a material factual dispute as to the terms of the 2013 Technology Agreement after the initial 36-month contract term expired in 2016. Horsetail contends that DSP elected "Option 1" of the contract's "BUYOUT / RENEWAL / PURCHASE OPTIONS." *See* ECF 58 at 11. Under "Option 1," DSP could "[e]xtend the existing service term for a predetermined period of time (minimum of 12 months) with the existing hardware and software" at half of the prior monthly rate of service. ECF 49-9 at 2. To support its position, Horsetail relies on Travis Sachse's sworn statement that, upon the expiration of the initial term, DSP kept the equipment, Horsetail billed DSP at a discounted monthly rate, and DSP paid the discounted invoices through October 2017. ECF 49-6, ¶ 12. Further, Horsetail contends that DSP was merely leasing the equipment because the 2013 Technology Agreement provides: "'The Devices and all software provided by Horsetail shall remain the sole and exclusive property of Horsetail.'" ECF 58 at 12 (quoting ECF 49-9 at 2). Therefore, Horsetail posits that following 2016, DSP leased equipment belonging to Horsetail, subject to Option 1 of the 2013 Technology Agreement.

By contrast, DSP vigorously disputes that its possession of the technology beyond 2016 reflects an agreement to lease the equipment in perpetuity. ECF 59 at 20-21. Rather, in DSP's view, the 2013 Technology Agreement was structured such that DSP would effectively pay the purchase price of the equipment over the course of the initial term. *See id.* Jackson testified that she did not recall whether the devices provided under the 2013 Technology Agreement were leased or purchased. ECF 59-3 at 10. And, Travis Sasche acknowledged during his deposition that after the initial 36-month term, at least some of the devices were likely worth less than the total fees Horsetail had collected. ECF 59-4 (T. Sasche Deposition) at 16-17. Travis also acknowledged that device agreements were typically structured such that the client paid the value of the equipment over the three-year term. *See id.* at 8-11. And, he admitted that the term "lease" does not appear in the text of the 2013 Technology Agreement. *Id.* at 6. Accordingly, as with the 2012 Email Agreement, there are triable issues regarding how the parties' conduct modified the terms of the 2013 Technology Agreement. *See Hovnanian*, 421 Md. at 122, 25 A.3d at 983.

Moreover, there is a genuine issue of material fact as to whether Horsetail breached its obligations to DSP under the 2013 Technology Agreement. Regarding breach, DSP avers that Horsetail was obligated to provide various services identified in "Exhibit B" of the contract (ECF 49-9 at 9), including anti-virus, endpoint security, backup, bandwidth monitoring, email encryption, email security, and Office 365, network monitoring. ECF 57-1 at 21-22. However, during Fayla's audit, DSP discovered numerous issues with its IT services, including that its firewalls were outdated; its routers were failing; the anti-virus security was not activated; and DSP was still operating Windows 7, not Windows 365. *See* ECF 57-1 at 22; ECF 57-15. Further, DSP contends that DSP was not monitoring its bandwidth because it was experiencing frequent network connectivity issues. *See* ECF 57-1 at 22; ECF 57-2, ¶¶37-38, 59-62; ECF 57-12 (Tickets and

emails concerning connectivity problems). And, Smith testified that DSP's two routers/firewalls were not functioning properly, resulting in network inefficiencies. ECF 57-24 at 51-53.

In response, Horsetail contends that under the terms of the 2013 Technology Agreement, it was only obligated to provide the services included in Exhibit B that were identified in Exhibit A and for which it billed DSP, namely "Bandwidth Monitoring Service," "Router as a Service," and "Switch as a Service." *See* ECF 58 at 13 (discussing ECF 49-10 at 9). Therefore, it asserts that it had no duty to provide anti-virus services or Windows 365. And, as to the covered services, Horsetail points out that the 2013 Technology Agreement expressly disclaimed all warranties. ECF 58 at 12-13 (citing ECF 49-9 at 7).

At a minimum, the 2013 Technology Agreement obligated Horsetail to provide bandwidth monitoring and router services. ECF 49-9 at 9. Indeed, in the October 2017 invoice, Horsetail billed DSP $300 for "Bandwidth Monitoring" and $350 for "Switch as a Service." ECF 49-6 at 11. Thus, DSP has adduced facts to question whether those services were in fact being provided in 2017. As a result, there is a genuine dispute of material fact as to whether Horsetail was in breach of the 2013 Technology Agreement.

## V. The 2016 Master Services Agreement

Horsetail asks the Court to find that DSP breached the Master Services Agreement (ECF 49-14) and is liable in the amount of $88,460.47, excluding interest and attorneys' fees. ECF 49-1 at 24-27. Horsetail contends that DSP cannot contest the validity of the contract. *Id.* at 24. And, it avers that it is indisputable that it diligently performed all services included in the contract. *Id.* According to Horsetail, Fitch's complaints concerning IT services are premised on an "inaccurate understanding of Horsetail's contractual obligations." *Id.* at 25. Further, Horsetail argues that

46

DSP breached the Master Services Agreement when it retained Fayla in November 2017 to perform work on its IT systems, in violation of the Supplemental TOS.  *Id.* at 26.

Horsetail is not entitled to summary judgment, DSP maintains, because there are genuine issues of fact regarding the authenticity of the documents provided by Horsetail.  ECF 57-1 at 35. DSP also questions whether the Master Services Agreement is valid, arguing Jackson lacked authority to execute the contract.  *Id.* at 36-37.  Moreover, DSP maintains that summary judgment is inappropriate because the parties dispute whether Horsetail's poor performance under the Master Services Agreement excused DSP's obligations to perform.  *Id.* at 38-39.

As a threshold matter, the Court finds that there is no genuine dispute as to the authenticity of the Master Services Agreement, but there are authenticity issues with respect to the Supplemental TOS.  Under Rule 901 of the Federal Rules of Evidence,  a proponent must establish that evidence is authentic by providing "evidence sufficient to support a finding that the matter in question is what the proponent claims."  Whether evidence is that which the proponent claims is a question of fact reserved for the jury.  *See United States v. Vidacak*, 553 F.3d 344, 349 (4th Cir. 2009); *United States v. Shah*, 125 F. Supp. 3d 570, 574 (E.D.N.C. 2015)  (observing that "authenticity itself is a question of fact for the jury").

Regarding the Master Services Agreement, DSP argues that the "authenticity of the 60-month version" of the contract relied on by Horsetail "is in dispute" because Jackson does not recall signing this version of the contract and a five-year initial term for an IT services contract is "uncommon" in the credit union industry.  ECF 57-1 at 35 (citing ECF 57-22 at 15-16 and ECF 57-2, ¶ 10).  However, as Horsetail observes, ECF 58 at 14-16, DSP is estopped from contesting the validity of the 60-month term in the Master Services Agreement.

A factual assertion in a pleading constitutes a "judicial admission" that precludes the party from the denying that fact later in the litigation.  *See Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 470 n. 6 (2013) ("'Factual assertions in pleadings and pretrial orders, unless amended, are considered judicial admissions conclusively binding on the party who made them.'") (citation omitted); *accord Worsham v. Accounts Receivable Mgmt., Inc*., 497 F. App'x 274, 277 (4th Cir. 2012).  In its Counterclaim (ECF 9), DSP alleges that the parties "entered into the most recent 'Master Services Agreement,' effective September 1, 2016 . . . under which Horsetail agreed to provide equipment and technology services for an initial period of sixty (60) months." *Id.* ¶ 59. It follows that DSP cannot now dispute that the Master Services Agreement contains an initial term of 60 months.

However, there is a material factual dispute as to the authenticity of the Supplemental TOS provided by Horsetail.  The document is neither dated nor signed. ECF 49-16.  Further, Finch attests that when she tried to access the Supplemental TOS on Horsetail's website the links did not function.  ECF 57-2, ¶ 113.  Horsetail responds that this is irrelevant because the "critical point in time is the *date the contract was executed*," which occurred more than a year before Fitch became CEO.  ECF 58 at 17 (emphasis in original).  In its view, because Christopher Sasche attests that the terms in the Supplemental TOS furnished by Horsetail were in effect in 2016, there is no dispute that the document is authentic.  ECF 58 at 17; *see* ECF 58-4 (C. Sasche Supplemental Affidavit), ¶ 4.

The eleventh-hour supplemental affidavit of Christopher Sasche does not eliminate the clear factual dispute raised by DSP as to the authenticity of the Supplemental TOS.  Each party has mustered admissible, persuasive evidence that calls into question whether the Supplemental TOS is authentic.  And, authenticity is a quintessential question for the fact finder.  Therefore, at

this stage, the Court cannot find that these terms are binding on DSP.  For that reason, the Court cannot conclude at this stage in the litigation that DSP's retention of Fayla was a breach of the Master Services Agreement.

Next, DSP contends that the Master Services Agreement is invalid because Jackson lacked authority to execute it.  This argument is without force.  There is no dispute that Horsetail sent DSP monthly invoices pursuant to the Master Services Agreement and that DSP timely paid those invoices between 2016 and October 2017.  *See* ECF 49-6, ¶ 19 (Travis Sasche stating that DSP paid invoices prior to termination).  And, Finch treated the Master Service Agreement as binding. Indeed, Horsetail's alleged failure to meet its obligations under the contract formed the basis of DSP's decision to terminate the relationship.  ECF 49-31; ECF 57-2, ¶¶ 36, 40, 41, 51, 52, 77. Therefore, because DSP ratified the Master Service Agreement through conduct, whether Jackson had authority to execute the contract is immaterial.  *See Tower Oaks Blvd., LLC v. Procida*, 219 Md. App. 376, 406, 100 A.3d 1255, 1273 (2014) (observing that a "corporation may be found to have ratified an unauthorized act by adopting it or acquiescing in it, by accepting and retaining its benefits, or by failing to timely disavow or repudiate it") (internal citations omitted); *see also Citizens Banks of Md. v. Md. Indus. Finishing Co., Inc.*, 338 Md. 448, 463 n.9, 659 A.2d 313, 320 n.9 (1995).

There are, however, material factual questions concerning Horsetail's performance under the Master Services Agreement.  DSP contends that Horsetail failed to provide the services outlined in the contract.  As noted, under the Master Services Agreement, DSP promised to provide various IT services identified in Exhibit A, as described in Exhibit B.  *See* ECF 49-14 at 7-11.  For instance, the umbrella of "HT Predictive Network Maintenance Services" encompasses monitoring DSP's network bandwidth; implementing "Microsoftpatching"; "ensur[ing] that

security patches are installed regularly"; monitoring hard drives; and "per NCIA guidelines," monitoring remote access usage.  *Id.* at 8.  Under the header "HT Helpdesk Services," DSP promised to provide "Responsive Support" through a ticket reporting system.  *Id.* at 9.  By promising to provide "HT Firewall Management," Horsetail promised to provide "NCUA Compliant monthly and on-demand device, security and compliance reporting."  *Id.* at 10.

DSP maintains that Horsetail fell far short of its obligations under the Master Services Agreement.  According to Fitch, the audit performed by Fayla revealed numerous deficiencies with DSP's IT systems.  ECF 57-2, ¶ 33; ECF 57-15.  The report prepared by Fayla provides that DSP's system was "outdated and vulnerable to new hardware compromises."  ECF 57-15 at 1.  DSP's "Wireless Networks" were "not configured" and no security reports had been generated in the prior twelve months.  *Id.* at 3. Further, Fayla reported that DSP had insufficient bandwidth availability and found that "[n]o frontier antivirus [or] malware protection had been installed."  *Id.*

Smith's deposition testimony also supports DSP's position that it was receiving inadequate IT services.  He testified that DSP's firewall "was almost dead," leaving the company susceptible to cyber attacks.  ECF 57-24 at 16; *see also* 51-52 (describing issues with the firewall).  Likewise, Fitch attests that DSP was not receiving monthly reports regarding the performance of IT services as provided for in the Master Services Agreement.  *Id.* ¶ 52.  Indeed, Fitch states that between October 2017 and January 2018, DSP never received a single report, despite having raised the issue with Berman in November 2017.  *Id.*  She also complains that, despite the Master Service Agreement including help-desk services through a ticketing system, Horsetail allowed Tickets to accumulate.  *See id.* ¶¶60-62.

Furthermore, emails produced in discovery suggest that Horsetail was not meeting its obligations under the Master Services Agreement. On October 27, 2017, Ireland emailed Fitch,

acknowledging that DSP "is outside of the norm in security and FFIEC basic standards," ECF 49-26, which could implicate certain services listed in Exhibits A and B.  And, in an email to Fitch on November 2, 2017, Berman outlined a number of concerns raised by Fitch, including that DSP was not receiving monthly reports.  ECF 49-27.

Horsetail, resisting the conclusion that its performance is up for debate, attacks the admissibility of DSP's evidence, namely the Fitch Affidavit and Fayla's audit report.  ECF 58 at 24.  Further, Horsetail posits that DSP's contentions are meritless because DSP fails to establish that any of the alleged IT issues relate to obligations explicitly specified in the Master Services Agreement.  *Id.* at 25.  These arguments do nothing to eliminate the stark factual dispute that DSP has raised.

With respect to Fayla's Report, Horsetail argues that it is inadmissible because it cannot be authenticated.  *Id.* at 23.  In particular, Horsetail asserts that Smith cannot authenticate the report because five different individuals, all of whom were independent contractors, contributed to its production. *See id*. (citing 49-30, Smith deposition, at 4-8).  But Smith, who worked on the audit and is a principal of Fayla, can testify to the findings included in the report at trial.  Further, DSP has put forth evidence from other sources to illustrate its IT troubles, including the Fitch Affidavit, emails, and Tickets.  Thus, even if the Court cast aside Fayla's audit, there is still sufficient evidence to create a genuine issue of material fact as to Horsetail's performance.

Horsetail's contention that DSP has failed to link its IT problems to obligations under the Master Services Contract fares no better.  DSP complains that its routers and firewalls were outdated, that its bandwidth was maxed out, that it was not receiving responsive IT support, and that it was not provided with monthly reports.  *See* ECF 57-1 at 28-29; ECF 57-2, ¶¶ 37-39, 59-62; *see also* ECF 49-26.  Yet, the invoice Horsetail transmitted to DSP in November 2017 shows

that Horsetail billed for services that touch on the same subjects.  *See* ECF 49-6 at 10.  Horsetail charged $865 for "HT Helpdesk service," for example, and $750 for "Backup and Recovery Service."  *Id.*  Thus, there is plainly a factual dispute concerning what services Horsetail promised to provide DSP under the Master Services Agreement and whether it kept its end of the bargain.

Ultimately, it may be that the IT issues DSP experienced do not fall within the services listed on the Master Services Agreement and billed by Horsetail.  But, the precise contours of the services that Horsetail promised to provide are not evident on the current record, and the parties fiercely dispute whether Horsetail breached the Master Services Agreement.  Accordingly, the Horsetail Motion must be denied with respect to the Master Services Agreement.

### V. The 2017 SBA

According to Horsetail, there is no genuine dispute that the 2017 SBA is valid and that it capably performed the services outlined in the contract.  DSP does not attack the validly of the 2017 SBA.  *See* ECF 57-1 at 29-31.  Nor could it.  The 2017 SBA was digitally signed by deFrietas on March 23, 2017, after receiving authorization from Cimo, DSP's CEO.  ECF 49-20; ECF 49-22.  Instead, DSP takes a different tack, arguing that Horsetail materially breached the 2017 SBA before DSP terminated the relationship.  *See* ECF 57-1 at 29-31.

After the 2017 SBA was executed in March 2017, DSP paid Horsetail a deposit of $16,288—nearly half the price of the contract.  ECF 49-21; *see also* ECF 52-23 (T. Sasche Deposition) at 13-14.  However, Fitch avers that when she became the CEO in October 2017, Horsetail had not yet delivered the server.  ECF 57-2, ¶ 64.  That is, nearly seven months after the contract's execution, Horsetail still had not purchased and installed a new server for DSP.  When Horsetail finally acquired a server in December 2017, it provided DSP with a R620 server, not the R730 server quoted in the 2017 SBA.  *Id.* ¶ 64; *see* ECF 49-12, ¶ 13.  According to Fitch, the R620

model is "not a server of equal value" to the R730 based on a comparison of the servers' specifications as described to her by Smith.  ECF 57-2, ¶ 65.

Conversely, Horsetail maintains that it performed under the 2017 SBA.  For starters, Berman avers that the differences between the R620 server and R730 server "would not negatively impact the planned uses of the server, and in many respects would be superior to the R730 identified on the 2017 SBA."  ECF 49-12, ¶ 13.  Moreover, the 2017 SBA expressly disclaims that the server DSP purchased would be the precise model quoted in the contract.  *See* ECF 49-20 at 4. In any event, Horsetail contends that DSP expressly approved the R630 server.  Specifically, Berman asserts that before the parties executed the 2017 SBA, he told Jackson that the refurbished server Horsetail would install might be different from the R730.  ECF 49-12, ¶ 12.  According to Berman, Jackson responded that this was acceptable.  *Id.*  Moreover, Berman states that after the agreement was executed, but before he purchased the R620 server, he spoke with Jackson, and she "instructed" him to purchase the R620.  *Id.* ¶ 13.

As to Jackson's approval, DSP counters that Jackson had no authority to permit Berman to purchase the R620 server.  ECF 57-1 at 30.  She had no actual authority, DSP argues, because she departed the company in September 2017.  Nor did she have apparent authority, DSP posits, because she told Berman that she was leaving DSP in September 2017, several months before Berman supposedly received permission from Jackson to install the R620.  *See* ECF 49-18 at 1.

Stepping back from this welter of arguments, two stark factual disputes emerge that go to Horsetail's performance under the 2017 SBA.  The first concerns whether the R620 server is comparable to the R730 server.  Because the 2017 SBA concerns the sale of goods, it is governed by the Maryland Uniform Commercial Code ("UCC").  *See* Md. Code § 2-105(1) of the Commercial Law Article ("C.L."); *see also Cambridge Techs., Inc. v. Argyle Indus., Inc*., 146 Md.

App. 415, 433, 807 A.2d 125, 135 (2002); *see, e.g.*, *Joswick v. Chesapeake Mobile Home, Inc.*, 362 Md. 261, 266-67, 765 A.2d 90, 92-93 (2001) (contract for the sale of a mobile home was covered under the Maryland UCC).

Under the Maryland UCC, a good is nonconforming if it is not "in accordance with the obligations under the contract."  C.L. § 2-106.  Further, where the contract lacks an express warranty, a warranty of merchantability is implied if "the seller is a merchant with respect to the goods of that kind."  *Id.*  § 2-314(1).  For a good to be merchantable, it "must . . . pass without objection in the trade under the contract description" and, "in the case of fungible goods, [be] of fair average quality within the description."  *Id.* § 2-314(2)(a)-(b).

The 2017 SBA effectively disclaims that DSP would provide a R730 server.  *See* ECF 49-20 (stating: "Inventory varies hourly. This server may not be available when the order is placed."). But, the 2017 SBA describes various characteristics of the R730 server, suggesting that any alternative model of server provided to DSP would be of similar quality to the R730.  *See* ECF 49-20.  And, the contract did not expressly disclaim the implied warranty of merchantability.  *See* C.L. § 2-316(2).

Thus, if the R620 matches the description of the server included in the 2017 SBA and is roughly comparable to the R730, then Horsetail would have discharged its obligations under the contract; if they are not, then Horsetail breached the agreement.

As discussed above, the parties sharply dispute whether the quality of the R620 relative to the R730.  Thus, DSP has raised a triable issue as to whether Horsetail performed under the 2017 SBA.  *See Champion Ford Sales, Inc. v. Levine*, 49 Md. App. 547, 554, 433 A.2d 1218, 1222 (1981) ("It is clear that the question of whether there exists a nonconformity which substantially

impairs the value to the buyer is one of fact, to be decided by the jury on the facts and circumstances of each individual case.").

Equally pertinent to whether DSP performed under the 2017 SBA is whether Jackson had apparent authority to instruct Berman to buy the R620 server on DSP's behalf.  If she did, then the quality of the R620 server is of no moment and Horsetail will have performed under the 2017 SBA.

Under traditional principles of agency law, the agent acts as a representative of the principal who, in turn, has the right to control the agent's actions.  *See* RESTATEMENT (THIRD) OF AGENCY § 1.01 cmt. c (2006).  An agency relationship can arise in one of two ways: actual or apparent authority.  *Jackson v. 2109 Brandywine, LLC*, 180 Md. App. 535, 565, 952 A.2d 304, 322 (2008). "'Actual authority to do an act can be created by written or spoken words or other conduct of the principal which, reasonably interpreted, causes the agent to believe that the principal desires him so to act on the principal's account.'"  *Dickerson v. Longoria*, 414 Md. 419, 442, 995 A.2d 721, 734 (2010) (quoting *Citizens v. Md. Indus*., 338 Md. 448, 459, 659 A.2d 313, 318 (1995)).  An agency relationship predicated on apparent authority "results from certain acts or manifestations by the alleged principal to a third party leading the third party to believe that an agent had authority to act."  *Klein v. Weiss*, 284 Md. 36, 61, 395 A.2d 126 (1978); *see Bradford v. Jai Med. Sys. Managed Care Orgs., Inc*., 439 Md. 2, 18-19, 93 A.3d 697, 707-08 (2014); *Parker v. Junior Press Printing Serv., Inc*., 266 Md. 721, 727-28, 296 A.2d 377 (1972).  "When a party asserts a claim that is dependent upon an agency relationship created by inference, that party has the burden of proving the existence of the principal-agent relationship, including its nature and its extent." *Jackson*, 180 Md. App. at 565, 952 A.2d at 322.

Here, the record does not make clear whether Jackson had apparent authority to act on DSP's behalf when she authorized Berman to purchase the R620 server.  On the one hand, Jackson

told Berman that she was leaving DSP in September 2017, and was "working on getting [her] responsibilities assigned to the appropriate staff member . . . ." ECF 49-18.  On the other hand, it appears that Jackson did not have a clean break with DSP.  Berman states that Jackson told him that she "would continue to be involved in the decision-making regarding DSP's IT's systems" after she left.  ECF 49-12, ¶ 10.  And, Jackson testified that she continued to work "on some projects" for DSP after her departure "to try to help them get through them in the transition."  ECF 49-10 at 4.  Notably, Finch states in her Affidavit that Jackson "had a contract to perform tasks as an independent contractor after her resignation in September 2016 . . . ."  ECF 57-2, ¶ 55.

In sum, given the factual conflicts regarding the quality of the server DSP received and whether Jackson had the authority to accept the server, the Court shall deny the Horsetail Motion as to the 2017 SBA.

## VI. The 2017 SQL Agreement

With respect to the 2017 SQL Agreement, Horsetail seeks summary judgment against DSP in the amount of $1,456.  ECF 49-1 at 15.  Horsetail maintains that it discharged its obligations under the contract when it purchased the SQL license on November 29, 2017, and installed it promptly thereafter.  *Id.* at 14 (citing ECF 49-6, ¶ 29); *see also* ECF 49-6 at 35 (11/29/2017 invoice).  It contends that DSP breached the 2017 SQL Agreement because, to date, DSP has not paid Horsetail for the license or cost of installation.  ECF 49-6, ¶ 29.  Indeed, Horsetail observes that Fitch admitted during her deposition that DSP had Fayla install the software instead.  ECF 49-1 at 15 (citing ECF 49-5 at 13-14).

DSP disagrees that it owes Horsetail under the 2017 SQL Agreement.  *See* ECF 57-1 at 31-33.  It argues that Horsetail made no effort to install the license after the 2017 SBA was executed in July 2017, prompting deFreitas to ask for an update on the project on October 10, 2017.  *Id.* at

32 (citing ECF 49-25 at 9).  Despite this, Horsetail still did not purchase the SQL license.  *See* ECF

49-6, ¶ 29; *see id.* at 35.  Moreover, Horsetail's purchase appears to have been prompted by an

email from Smith to Ireland on November 29, 2017, warning that if Horsetail could not purchase

the license "immediately," he would "remote it and buy it and install."  ECF 57-19 at 6.  An email

from Berman to Ireland the same day stated, *id.* at 5: "[Smith] is in disaster relief mode. We can't

be the cause for unreasonable delay."  Therefore, in DSP's view, "Horsetail promised something

that it did not deliver in a timely fashion, and is attempted to overcharge [DSP] for work it did not

perform satisfactorily within the parameters of the contract."  ECF 57-1 at 33.

At bottom, the parties' dispute centers on whether the lapse in time between the execution

of the 2017 SQL Agreement in July 2017 and Horsetail's performance in November 2017 renders

the contract unenforceable.  In Maryland, "it is a general principle of contract law that when a

contract calls for performance but does not specify a time, a reasonable time will be implied."

*Prison Health Servs., Inc. v. Balt. Cty*., 172 Md. App. 1, 13, 912 A.2d 56, 63 (2006) (citing

*USEMCO, Inc. v. Marbro Co., Inc*., 60 Md. App. 351, 365, 483 A.2d 88 (1984)); *see also Anne*

*Arundel Cty. v. Crofton Corp*., 286 Md. 666, 410 A.2d 228 (1980).  The Maryland Court of Appeals

has instructed that what constitutes a reasonable duration is a term to be supplied by the court.  *See*

*Boland v. Boland*, 423 Md. 296, 370, 31 A.3d 529, 574 (2011); *Lerner v. Lerner Corp.*, 132 Md.

App. 32, 45, 750 A.2d 709, 716 (2000).  That is, despite the seemingly factual nature of this

question, it is for the court to resolve.  *See Standard Scale & Supply Co. v. Balt. Enamel & Novelty*

*Co*., 136 Md. 278, 110 A. 488, 488 (1920) ("[T]e question of what was a reasonable time was

clearly one of law for the court, and not for a jury.").

When "making this determination, the court should look to the subject matter of the

agreement in an effort to supply a durational term that produces a reasonable result."  *Lerner*, 132

Md. App. at 45, 750 A.2d at 716; *see* Restatement (Second) of Contracts § 204 cmt. d. Further, a court "may consider all relevant circumstances—including circumstances as of the time entering into the agreement, events thereafter, and considerations of policy and fairness." *Id.* Put simply, this is "a totality of the circumstances" inquiry. *Id.*

On the present record, I cannot determine whether Horsetail performed its obligations under the 2017 SQL Agreement in a timely manner. To be sure, there is no dispute that Horsetail did not purchase the SQL license until November 2017. But, it is not obvious that the blame for this delay should fall squarely on Horsetail.

It appears that DSP and Horsetail shared an understanding that DSP would upgrade its Imagecenter software before Horsetail acquired and installed the SQL license because the 2016 SQL software was compatible with the Imagecenter 2017, but not the older version of Imagecenter that DSP utilized at the time the contract was executed. *See* ECF 49-25 at 8-9. On the other hand, even after deFreitas and DiGiacomo made a plan to install the SQL software in October 2017, Horsetail took no action until it purchased the license on November 29, 2017. And, it is hardly a coincidence that Horsetail obtained the license the same day that Smith told Berman that he planned "immediately" to perform the SQL upgrade if Horsetail did not.

Therefore, because I cannot determine on the facts before me whether Horsetail's performance was timely, I cannot conclude as a matter of law that the 2017 SQL Agreement was enforceable in November 2017. It follows that Horsetail is not entitled to recover under the 2017 SQL Agreement at this juncture.

## IV.    Conclusion

For the foregoing reasons, I shall deny the Horsetail Motion (ECF 49). As for the DSP Motion (ECF 57), I shall grant it with respect to the 2012 Services Agreement but deny it as to the

remaining contracts.

 An Order follows, consistent with this Memorandum Opinion.


Date: June 19, 2020            _____/s/_____

                Ellen L. Hollander
                United States District Judge